**SACK & SACK, LLP**
**Jonathan S. Sack, Esq.**
**Attorneys for Plaintiff**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
www.sackandsack.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x

| | |
|---|---|
| **WILLIAM H. JENNINGS, II** : <br> Plaintiff, : <br> : <br> — against — : <br> : <br> **HUNT COMPANIES, INC.** and **HUNT FINANCIAL** : <br> **SERVICES, LLC** : <br> , : <br> Defendants. : | **Case No.** _____ <br><br><br> **COMPLAINT** |

------------------------------------------------------------------------- x

Plaintiff, **WILLIAM H. JENNINGS, II** ("*Plaintiff*" or "*Jennings*"), by his attorneys, Sack & Sack, LLP, brings this Complaint against Hunt Companies, Inc. and its wholly owned subsidiary, Hunt Financial Services, LLC ("*HFS*" or "*Defendants*") based upon the following allegations:

## NATURE OF ACTION

1.      While the claims herein are grounded in breach of contract, the allegations detail the bad-faith re-trade of a conglomerate of wealthy families who sought to expand their empire by venturing into the financial services business and building a broker / dealer business from the ground up.

2.      With significant financial means, Chris Hunt and his minions courted Plaintiff Bill Jennings, one of Wall Street's most successful veterans in the broker /

dealer business with more than 25 years of experience in the sales, trading and management of fixed income securities businesses.

3.     To induce Jennings out of retirement and wade back into the financial services business and start over, from scratch, to build a brand-new broker / dealer business, Defendants used the carrot of generous compensation and multi-year, tens-of-millions of dollars compensation commitments in order to demonstrate to Jennings that they were committed to his effort if he would commit his knowledge, acumen, contacts, and most valuable goodwill to build and run the broker / dealer business Defendants wanted.

4.     To that end, Chris Hunt prepared and provided a spreadsheet for Jennings to induce him; a seven-year revenue projection showing Jennings would be paid a stunning minimum $58,800,000 (20% of $294,000,000).  And that sum for Jennings was simply on the cumulative compensation pool.  (Exhibit "A")

5.     Shortly after inking their commitment in a thoroughly drafted express contract, which is memorialized in two agreements – the Employment Agreement and the Manager Agreement – Jennings began to deliver, and he did so swiftly, successfully and beyond expectation.

6.     However, once Jennings delivered a fully functional, profitable and operational broker /dealer business that was fully equipped with resources, strategies, a business course and, importantly, a professionally staffed team Jennings handpicked from

his contacts and goodwill, Defendants aggressively attempted to retrade its carrot, quickly turning it into a stick.

7.     First, Defendants tried to get Jennings to renegotiate the contract terms that were originally negotiated and greed upon.

8.     Then Defendants tried to get Jennings to resign.

9.     Once those two options failed, Defendants were left with two choices, honor its express agreements with Jennings, or breach them.  Defendants chose the latter.

10.     Following conflicting and sham, bad faith reasons for a "Cause" termination, Defendants ultimately terminated Jennings' employment without Cause, thus breaching its agreements with Jennings, and thereby causing him to sustain significant damage of at least **Seventy-One Million Eight Hundred Thousand ($71,800,000) Dollars** as detailed herein.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a).  The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     Venue is appropriate in this district under 28 U.S.C. § 1391(a).  The acts which give rise to this Complaint took place in this District.

## THE PARTIES

13.     Plaintiff Bill Jennings resides at 6 Homewood Lane, Darien, Connecticut 06820.

14.     Hunt Financial Securities, LLC, ("HFS" or "the Company") is a wholly-owned subsidiary of Hunt FS Holdings, LLC, which, itself, is a wholly owned subsidiary of Hunt Company, LLC which is wholly owned by Hunt Companies, Inc. ("HCI'' or "Hunt")

15.     HFS is a limited liability company that was formed under the laws of the State of Delaware to serve as parent entity of the then shell broker-dealer arm of Hunt.

16.     HFS is registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under the Securities Exchange Act of 1934 and is a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). The Company is a broker-dealer that provides business advisory services and acts as a private placement agent with respect to structured financings and/or other financings.

17.     Hunt is a Delaware corporation, with its principal place of business located at 4401 North Mesa, El Paso, Texas 79902-1107 and a regional office located at 230 Park Avenue, 19th Floor, New York, New York 10169.

# FACTS[1]

The claims set forth herein arise from the following set of facts:

## JENNINGS' WELL-CREDENTIALED PROFESSIONAL CAREER IS PERFECT FOR LEADING HUNTS' PLANNED EXPANSION INTO THE SECURITIES BROKER/DEALER BUSINESS

### *Jennings' Wall Street Career*

18.    Jennings is a successful Wall Street executive who has more than 25 years of experience in the sales, trading and management of fixed income securities businesses.

19.    Jennings commenced his Wall Street career with Lehman Brothers in 1992.

20.    From 1992 to 2004, Mr. Jennings spent twelve years at Lehman Brothers, where he served as Managing Director and for several years, was the top salesperson in its Fixed Income Division.

21.    In 2004, Jennings joined RBS Greenwich Capital as a Managing Director, Mortgage Sales. From 2005 to 2008, Jennings was the top revenue producing mortgage salesperson for RBS Greenwich Capital.

22.    Jennings served as Managing Director of its Structured Product Division.

23.    In 2008, Jennings joined Jefferies Group Inc. ("*Jefferies*").    Initially, he was hired to the position of Co-Head of Mortgage and Asset-Backed Securities. Jennings' last position at Jefferies was Global Co-Head of its entire Fixed Income Division.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

24.     While Jennings was tasked with running Jefferies' Fixed Income Division, Jefferies enjoyed stellar and significant growth, contributing to a tripling of its market capitalization over the course of Jennings' employment.

25.     In January, 2014, at the age of 47, Jennings retired.

### The Hunt Companies

26.     The Hunt family of companies are a group of privately owned companies run by the Hunt Family that are purportedly dedicated to fostering long-term partnerships through the development, investment, management, and financing, mainly of real estate assets.

27.     Founded in 1947 and headquartered in El Paso, Texas, Hunt is a diverse, full- service real estate company.

28.     Hunt's primary business focuses on real estate investments, military communities, public infrastructure, financial services, and asset services.

29.     HFS is one of Hunt's wholly owned subsidiaries that was formed to serve as parent entity of the then shell broker-dealer arm of Hunt.

30.     HFS, through its subsidiaries, is a nationwide specialty finance company focused on commercial real estate finance and investment management.

31.     The Company's Hunt Mortgage Group, LLC ("HMG") subsidiary provides financing for a wide variety of property types, including multifamily, affordable housing, manufactured housing, healthcare/senior living, office, retail, industrial, and self-storage

facilities throughout the United States. Through its subsidiaries, HMG is a Fannie Mae, Freddie Mac, Ginnie Mae ("GNMA"), and HUD/FHA licensed lender and lends for its own account.

32.     The Company's Hunt Investment Management, LLC ("HIM") subsidiary is a registered investment advisor which provides investment management services to institutional investors in both private equity funds and managed separate accounts, across various property sectors in the United States and Europe with an emphasis on the multifamily sector.

33.     The Company's Cazenovia Creek Investment Management, LLC ("CCIM") subsidiary, acquired in April 2016, controls several entities engaged in the business of acquiring real estate tax lien certificates. The Company's Bankers Guarantee Title and Trust subsidiary ("BGTT") provides financing for residential properties in Ohio and Texas and is also a licensed title insurance company. BGTT is licensed to provide residential loans through Fannie Mae, GNMA, and HUD/FHA lending programs.

34.     The Company, through its subsidiaries, also invests in various commercial real estate loans, securities, and other investments for its own account.

### *Hunt Targets Jennings To Build A Broker/Dealer Business*

35.     In October 2016, while happily ensconced in his retirement and living in Florida, Jennings received a telephone call from Marc DeFife, Hunt's Executive Vice President.

36.     Jennings knew DeFife.  DeFife worked for Jennings at Jefferies, where DeFife headed up Jefferies' Mid-West Sales Region.

37.     DeFife is also a member of the Hunt Executive Management Leadership Team, together with Hunt's CEO, James C. Hunt ("Chris Hunt") and Kara Harchuck, Hunt's Executive Vice President and General Counsel.

38.     During this initial call, DeFife told Jennings that the purpose of his call was to inquire whether Jennings would sit down with Chris Hunt to discuss a significant business opportunity, for which Jennings would be a **"perfect fit."**

39.     Jennings explained to DeFife that he was retired and not in the market for returning to the "rank and file" of bulge-bracket Wall Street bureaucracy.

40.     In response, DeFife reminded Jennings that several companies under the umbrella of the Hunt Family of Companies were once clients of Jennings during his successful tenure at Jefferies.

41.     DeFife implored Jennings, to take the meeting because, DeFife stated, **"We are talking about a game changing opportunity worthy of your effort.  Bill, we are talking generational wealth creation for you.  You are going to build out our broker / dealer and you are going to own a significant portion of it.  We plan to build a billion dollar business together. "**

42.     Indeed, Jennings and DeFife had a great deal of appreciation for the value of Jennings' relationships, contacts and colleagues.  Indeed, Jennings' long list of clients that made up his valuable rolodex, encompassing more than three decades of trades, investment idea generation and dissemination, networking, seminars, meetings, outings, offsites and his proven track record of significant value creation was something Hunt sought.

43. Jennings was a talented human asset to all of his prior employers. Jennings' compensation history demonstrates his worth to employers and his demonstrated ability to create value.

44. For the prior five years of his employment, Jennings had been earning between Ten Million ($10,000,000) Dollars and Twenty-Two Million Eight Hundred Thousand ($22,800,000) Dollars per year in compensation.

45. Thanks to clients such as Hunt, Jennings was successful in growing Jefferies' overall fixed income business from Thirty-Plus Million ($30,000,000 +) Dollars per year in 2008, with fourteen (14) sales and trading people in mortgages to over One Billion ($1,000,000,000) Dollars per year with five hundred plus (500 +) employees in Fixed Income globally by the time he retired from Jefferies.

46. As later admitted by Hunt's CEO, Chris Hunt, it was *this* type of success that made Jennings such a high-value target for Hunt to acquire to spearhead the build-out its nascent broker/dealer business.

47. During their initial conversations, DeFife told Jennings that Hunt was looking to ramp up and launch an expansion for its financial services sector of businesses (including Hunt Mortgage Group, Hunt Investment Management and Caz Creek).

48. In furtherance of this mandate, DeFife told Jennings that Hunt had money to spend. DeFife told Jennings that Hunt was **"in the market for and considering purchasing"** an already existing broker / dealer business.

49. Nonetheless, DeFife asked Jennings whether he would be interested in building a broker/dealer business from the ground up before Hunt went down the acquisition path.

50.     DeFife also confided to Jennings that **"Chris Hunt was well aware of your [Jennings'] reputation for building businesses from the ground up."**

51.     Both Marc DeFife and Chris Hunt later admitted on several occasions **"there's nobody else that could build a broker dealer [business] like this, except for Bill Jennings."**

### *Hunt Induces Jennings to Build a Broker/Dealer Business for its Group of Businesses*

52.     On or around October 4, 2016, Jennings met with Chris Hunt and Marc DeFife to discuss Jennings' role and compensation arrangements in the future of the Hunt Companies.

53.     During this meeting, Jennings was asked whether he would be interested in building out a broker / dealer business for the Hunt Companies from the ground up.

54.     Jennings told Marc DeFife and Chris Hunt that he was interested but that in order to properly build a broker dealer business, he would need to spend money to hire sales and trading professionals from various firms that included firms such as Performance Trust Capital Partners, LLC ("*Performance Trust*") and KGS, as well as other existing broker / dealer firms.

55.     At the time, Jennings explained to Chris Hunt and Marc DeFife the importance of being able to go to firms such as Performance Trust and KGS to recruit high-level and quality sales and trading professionals.  Jennings stated this in light of his disclosed in light of his pre-existing covenant not to solicit employees from his former employer, Jefferies.

56.     At the time, coincidentally, and unbeknownst to Jennings, Hunt was already entrenched in negotiations with *both* Performance Trust and KGS to purchase their existing broker / dealer businesses.

57.     In fact, Hunt and Performance Trust had already entered into a Non-Disclosure Agreement ("NDA") on or around September 22, 2016 "in connection with [Hunt's] consideration of a possible transaction with Performance Trust…". (Exhibit "B")

10

58.     Despite Jennings' candor, neither Chris Hunt nor Mark DeFife ever revealed the pre-existing NDA between Hunt and Performance Trust.

59.     Amazingly, throughout the Fall of 2016, even though Hunt had been wooing Jennings, in an effort to induce him out of retirement to build a business from the ground up, Hunt not only had a "handshake agreement" to purchase a significant stake in Performance Trust.

60.     Incredibly, a term sheet had already been entered into between Hunt and Performance Trust as of the first time DeFife picked up the phone to talk to Jennings about working with Hunt.

61.     As more fully set forth herein, following Jennings' hire, Jennings and others, at the direction of Chris Hunt, unwittingly solicited the hire of several Performance Trust employees, in violation of the NDA.

62.     Consequently, when no Hunt / Performance Trust deal was reached, and following Hunt's hiring of several Performance Trust employees, Hunt was sued in New York State Supreme Court, asserting a breach of contract in violation of the parties' NDA.

63.     Both Chris Hunt and Marc DeFife would later lie (and admit the lie under oath in court proceedings) about the timeline of events in order to defend itself in a lawsuit brought by Performance Trust against Hunt.

64.     Specifically, Chris Hunt swore in an affidavit filed by Hunt in the Performance Trust litigation, (Performance Trust Capital Partners, LLC v. Hunt Companies, Inc., New York State Supreme Court, Index Number 651355/17), that **"[t]he most I ever told [Jennings] is that Hunt was *considering* buying a stake in a company that might obviate the need for hiring Jennings"**.

65.     Hunt NEVER told Jennings that the "*considering*" was more akin to "*close to purchasing*" nor did Hunt EVER tell Jennings that purchasing a stake in a turn-key broker dealer would "*obviate the need for [his] hiring…*"

66.     The *Hunt / Performance Trust* venture ended poorly for Hunt, as described more fully below, costing Hunt more than $8 million dollars in a settlement payment to Performance Trust, (and another $1 million dollars to affected Performance Trust employees), all of which could have been avoided with transparency, prudence and *plain ole' integrity* by Chris Hunt and Hunt executives.

67.     To make matters worse, the two Performance Trust employees who were already working at HFS, were not subject to any restriction, and indeed, were poached away from HFS and back to Performance Trust!

68.     For $8,000,000, HFS should have been able to retain the talent that Jennings helped to acquire.  In other words, Performance trust got the money and the talent while HFS got zero.

69.     In response to Jennings' request for resources at their initial meet, Marc DeFife and Chris Hunt replied that Jennings should put together a business plan of what is entailed in getting this broker / dealer build-out project off the ground.

70.     Jennings had a formula to build out a successful sales and trading platform, which, among other things, mandated that Hunt's new broker / dealer would pay people well on a commission-based formula monthly in cash, where they share in the results of their success.

71.     Most other firms are and were compensating their sales and trading professionals with a salary and annual discretionary bonus, and Jennings' business plan would be more financially attractive to the best professionals.

72.     DeFife and Chris Hunt assured Jennings that Hunt was not only capable, but prepared, to provide Jennings with whatever resources he needed; **"Hunt is at your disposal."**

73.     Based upon these initial representations, Jennings hit the ground running.

74.     On or about October 11, 2016, Jennings sent Chris Hunt and Marc DeFife a comprehensive business plan contemplating the build-out of the Hunt broker / dealer business.

75.     This was followed by several comprehensive telephonic phone conferences with Chris Hunt to negotiate the ultimate deal.

76.     On November 1, 2016, Jennings flew to Austin, Texas, Hunts' home base, to have dinner with Chris Hunt and to further discuss the broker / dealer build-out as well as review the business plan that Jennings hand-tailored for Hunt.

77.     Given Hunts' existing business conglomerates and their stated desire to embark on this new venture, Jennings indicated the start-up costs associated with this venture.

78.     During this, and several subsequent conversations in the Fall of 2016, Chris Hunt purposefully hid from Jennings the fact that while Hunt was wooing Jennings to invest his time and acumen into building a broker dealer business, Hunt was in simultaneous talks and due diligence with Performance Trust to purchase their turn-key operation.

79.     While Chris Hunt was misleading Jennings by repeatedly assuring Jennings he would have *carte blanche* with Hunt's monetary and back-office resources to **"do whatever needs to get done to do this business right,"** Hunt was engaged to Performance Trust.

80.     By November 17, 2016, Hunt provided Jennings with a proposed agreement to build the broker-dealer for the Hunt Companies that included an initial minimum guarantee compensation budget of Ten Million ($10,000,000) Dollars per year, which budget included Jennings' Two Million ($2,000,000) minimum annual compensation.

81.     At the time, Chris Hunt further represented to Jennings that Hunt had the infrastructure in place to support Jennings in building the broker / dealer.

82.     In time, Jennings, unfortunately, would find out that that was not the truth at all.

### Hunt Induces Jennings' Full Commitment to Building its Broker / Dealer Business By Agreeing to Certain Significant Contract Terms of Employment and Equity in the Venture

83.     During the month of December 2016, Hunt and Jennings conducted intense negotiations over the terms and conditions governing Jennings' anticipated long-term employment and vested ownership interest in the to-be-launched Hunt broker / dealer business he was being induced out of retirement to build.

84.     Importantly, the compensation arrangement between Hunt and Jennings was two-fold, comprising of two agreements that were intended to work hand-in-hand.

    a.   *Management Agreement* (Exhibit "C") between Hunt and Jennings for Jennings to serve as manager of HFS "to build and manage a newly created broker / dealer platform of Hunt that focuses on securitizing, trading, and distributing all fixed income products, including those originated by Hunt or its Affiliates";[2] and

    b.   *Employment Agreement* (Exhibit "D") between HFS and Jennings governing Jennings' contemplated long-term (guaranteed, and minimum, at least seven (7) year) employment with HFS as its President whose "duties, responsibilities, and authority will be those outlined in the Management Agreement."[3]

85.     During this time, December 2016, positive buzz and word spread throughout the Wall Street *rumor mill* that Jennings was coming out of retirement to once again build a significant footprint in the Broker/Dealer business.

---

2 See, Management Agreement, Recitals
3 See, Employment Agreement, § 1.2

86.     Given the army of sales and trading professionals who would jump at an opportunity to work at a new platform with commission payouts (as opposed to salary / discretionary annual bonus), Jennings knew that with the mandate to build, attract and incent the best professionals, would be like attracting bees to honey.

87.     As a result, several firms and headhunters reached out to Jennings with overtures competitive to those of Hunt.

88.     Hunt too, heard rumors that other firms were seeking to lure and hire Jennings. As a result, Hunt increased its offer of compensation incentives (in the form of an increased percentage of equity) to further induce Jennings to sign with them.

89.     Among the significant incentives offered to Jennings by Hunt was a seven (7) year guaranteed term of employment with a guaranteed minimum compensation of Fourteen Million ($14,000,000) Dollars.

90.     By December 30, 2016, Kara Harchuck, the General Counsel of Hunt, transmitted draft agreements to Jennings, which were prepared by outside counsel; lawyers at the law firm of Paul Weiss.

91.     On January 9, 2017, Jennings executed the final versions of his agreements with Hunt.

92.     The Management Agreement described Jennings' overall objectives in respect of his building out Hunt's broker-dealer business, HFS:

> Manager shall use his best efforts to operate, and to cause the Employees to operate, the Business and manage the assets of the Business allocated or otherwise made available to it by Hunt in accordance with this Agreement, the Business Plan, and the Budget (Management Agreement, § 1(b))

93.     Importantly, and despite that actions and statements by Hunt to the contrary, the Management Agreement's clear and unambiguous terms conferred upon Jennings' a liberal and absolute authority and autonomy to manage HFS' business as he deemed.

94.     Section 2.2 of the Management Agreement, "Authority of Manager" provides:

> **Authority of Manager**.  ... Manager shall, in the good-faith exercise of his business judgment conduct and direct the day-to-day affairs of the Business in accordance with the Budget and the Business Plan. Manager shall keep the Management Committee generally appraised of material matters relating to the day-to-day conduct of the Business and shall provide such other information and general reporting to the Management Committee as the Management Committee may reasonably request from time to time.

95.     Furthermore, Hunt's commitment to Jennings' long-term efforts in building a broker-dealer business from scratch is captured in Jennings' minimum, guaranteed Seven (7) Year contract.

96.     Specifically, the Employment Agreement provides that:

> "Notwithstanding the foregoing, prior to the **seventh anniversary of the Launch Date**, the Company may not terminate Executive's employment without Cause, and Executive may not resign (other than in the case of death or Disability) without Good Reason..." (Employment Agreement § 3.1)

### *Jennings Hits the Ground Running and Demonstrates Immediate Success in Building a Broker/Dealer Infrastructure*

97.     Immediately following execution of his agreements with Hunt, Jennings hit the ground running in commencing efforts to build out Hunt's broker/dealer business.

98.     In just two months' time, Jennings took an office shell of space in a commercial office building located in Rye Brook, New York, and turned it into a fully functioning trading

floor built with expansion room for at least 50 employees, despite being told by Hunt's Head of Technology that the internet connection would take 90 days.

99.     Jennings was involved in the details of organizing, building and coordinating all aspects of the firm, literally.  He worked with architects, technology firms, building facilities, and helped to purchase furniture, desks, computers and phone systems and software.  In addition, Jennings orchestrated the build-out of trading books, a P/L system, controls for middle and back office, compliance, legal, funding, risk management and he coordinated the hiring of FINOP, Chief of Compliance, repo traders, sales and trading personnel, capital markets and support staff.

### Hunt Breaches It Agreements With Jennings by Concealing Its Deliberately Unlawful Actions With Respect to Performance Trust

100.     As previously mentioned, at the time Hunt commenced efforts to recruit Jennings to build from scratch its broker / dealer business, Hunt had already been intimately and legally engaged with Performance Trust in a significant due diligence protocol for purposes of purchasing a significant part of Performance Trust's business.

101.     As of September 22, 2016, weeks prior to the first meeting with Jennings, Hunt and Performance Trust had already entered into a NDA "in connection with [Hunt's] consideration of a possible transaction with Performance Trust…" (the "*NDA*").

102.     Shortly after Jennings' commencement, Hunt unapologetically and brazenly breached the NDA with Performance Trust, they were at the receiving end of a lawsuit filed by Performance Trust on March 15, 2017 in the New York Supreme Court, captioned Performance Trust Capital Partners, LLC v. Hunt Companies, Inc., New York State Supreme Court, Index Number 651355/17 (the "*Performance Trust Litigation*").

103. After the commencement of the Performance Trust Litigation, Jennings learned of the extent that Hunt misrepresented to and concealed from Jennings the significant steps that were taken by Hunt in furtherance of its pursuit to purchase Performance Trust, none of which was disclosed to Jennings either before or after his hiring to build out and run HFS' broker / dealer business.

104. Indeed, Hunt purposefully concealed from Jennings the existence of any of the legal protections in place that would have otherwise prohibited Jennings from hiring, or even attempting to hire, Performance Trust employees (pursuant to the NDA) even though they (Chris Hunt, Marc DeFife and Kara Harchuck) knew that Jennings had intended to recruit and helped to hire Performance Trust employees and was actively recruiting and hiring Performance Trust employees.

105. In an attempt to defend their actions in the Performance Trust Litigation, both Marc DeFife and Chris Hunt filed sworn affidavits with the New York State Supreme Court in the Performance Trust Litigation that contained blatant falsehoods in derogation of the illegalities of committing perjury.

106. Indeed, when the Performance Trust Litigation was filed, Jennings was called into a room by senior executives at Hunt and was asked to make statements under oath that Jennings knew to be false but would otherwise support the defenses to be asserted by Hunt in response to the Performance Litigation.

107. Jennings refused to participate in Hunt's unlawful scheme and thus, as can be seen from a review of the docket in the Performance Trust Litigation, there is no affidavit submitted for Jennings.

108.   In an apparent effort to *go back in time* and change history and thus alter the sting of their unlawful actions, both Marc DeFife and Chris Hunt attempted to push back the date they first recruited Jennings to build out the broker / dealer to a date prior to Hunt's execution of the NDA.

109.   Specifically, in an affidavit filed by HFS' CEO Chris Hunt (Exhibit "E"), on March 20, 2017 (Docket #15), Chris Hunt swore that **"In the late summer of 2016, Marc DeFife spoke with Bill Jennings about the possibility of building out Hunt Financial in the future.  Eventually Marc DeFife, Bill Jennings, and I had dinner in New York, New York, which occurred on October 4, 2016."**  (Chris Aff. ¶ 14)

110.   Jennings never spoke with Marc DeFife in **"late summer of 2016"** about any possibility of working with Hunt on anything.

111.   The first time Jennings spoke with anyone specifically at Hunt about any employment and business opportunity was on October 4, 2016.

112.   The NDA was entered into on September 22, 2016.

113.   This fact would also explain the discrepancy in Marc DeFife's affidavit on the same fact, where DeFife fails to corroborate Chris Hunt's' testimony that DeFife spoke with Jennings "in the late summer of 2016" about "the possibility of building out Hunt Financial in the future" and then "eventually" had dinner on October 4, 2016 in New York.

114.   Instead, DeFife confirms (Exhibit "F") that the first meeting and/or discussion with Jennings was not until after the NDA was entered into on September 22, 2016: "In late summer of 2016, Chris Hunt, Bill Jennings, and I had dinner in Austin, Texas, which occurred on October 4, 2016, to continue our discussions about hiring Bill."  (DeFife Aff. ¶ 12)

115.    DeFife purposefully does not specify with "whom" he continued discussions "about hiring Bill", because it was *not* Jennings.[4]

116.    The Complaint filed in the Performance Trust litigation details a disturbing course of action undertaken by Hunt that involved "various acts of wrongdoing" after Hunt expressed an interest in purchasing 30% equity in Performance Trust, which Hunt was going to use to enter into the broker / dealer business.

117.    As background, Performance Trust alleged that Hunt expressed an interest in investing capital into Performance Trust and requested the opportunity to conduct due diligence of Performance Trust to assist in Hunt's investment decision.   Performance Trust would not furnish any of its confidential information, including confidential information about its employees, unless Hunt executed the NDA.

118.    After executing the NDA on September 22, 2016 and being furnished full access to Performance Trust's confidential information, Hunt terminated negotiations with Performance Trust and hired three high revenue-generating employees of Performance Trust - Steve Kirchner, Jay Park, and Sol Berkoff.

119.    Throughout the entire time Hunt was attempting to pillage Performance Trust's broker / dealer business under the guise of "due diligence" *Trojan Horse Style*, Hunt **never** disclosed to Jennings that it had a NDA in place with Performance Trust.

120.    Hunt **purposefully concealed** from Jennings the extent of the dealings between Hunt and Performance Trust, even though it directly impacted Jennings' duties and responsibilities as Manager and as imminent President of HFS.  Similarly Hunt never disclosed

---

4 Though not significant for purposes of Jennings' claims, but illustrative of their arrogant indifference for the truth and accuracy of their own sworn statements, the dinner referenced actually took place in New York City and not in Austin, Texas.  As of October 2016, Jennings had not been in Austin, Texas for over two years.

to Performance Trust that it had decided to forego any deal with Performance Trust in favor of building out its broker/ dealer business under Jennings' leadership, even long after it had done so.

121.    The Performance Trust Litigation accused Hunt of engaging in bad acts and nefarious conduct that, among other things (i) breached the unambiguous provisions of the NDA that prohibited Hunt from hiring Performance Trust's employees and (ii) caused the procurement of breaches of various employment agreements by the three revenue-generating employees identified by Hunt under the ruse of due diligence (which included 41 visits to a data room), and, ultimately, hired by Hunt after Hunt abruptly terminated the negotiation with Performance Trust.

122.    A timeline of Hunt's misdeeds makes apparent the reprehensible actions of Hunt with respect to their dealings with Performance Trust and Jennings:

- September 22, 2016 -- Hunt executed the NDA;

- September 28, 2016 -- Representatives of Hunt and representatives of Performance Trust met and discussed the details of a significant business transaction;

- October 19, 2016 through October 24, 2016 -- As part of its due diligence, Hunt accessed the data room created by Performance Trust on approximately 41 occasions;

- October 24, 2016 -- Hunt conducted in-person interviews of certain members of the Capital Management Group of Performance Trust in Performance Trust's offices to discuss the synergies that may be created between Hunt and Performance Trust, which members included Steven A. Kirchner. ***Hunt was fishing in Performance Trust's pond***;

- November 4, 2016 - Representatives of Hunt and representatives of Performance Trust had a telephone conference to discuss the synergies that may be created between Hunt and Performance Trust and the Capital Raise, and during the discussion the identities of Solomon P. Berkoff and Jay Yun Park were disclosed to Hunt;

- November 15, 2016 -- Representatives of Hunt and the Chief Executive Officer of Performance Trust met in Hunt's offices in Chicago and discussed the Capital Raise;

- November 29, 2016 -- Representatives of Hunt and representatives of Performance Trust met, discussed a potential transaction and agreed upon the terms of that transaction with a "handshake";

- November 30, 2016 -- a draft term sheet was sent to Hunt by Performance Trust;

- December 1, 2016 -- Representatives of Hunt and Performance Trust's financial advisor had a telephone conference to discuss the draft term sheet;

- December 7, 2016 -- Notwithstanding the agreement and the "handshake", Hunt abruptly terminated negotiations with Performance Trust;

- January 19, 2017 – Kara Harchuck sent Brian Pereira and Jennings offer agreements for 6 hires to join Hunt, which included agreements for Kirchner, Berkoff, and Park.

- January 20, 2017 - Kirchner, Berkoff, and Park meet with DeFife.  During this meeting, Kirchner, Berkoff and Park ask DeFife point-blank whether Hunt there any legal restrictions on Hunt's ability are to solicit and employ them away from Performance Trust.  DeFife, who was directly, actively and intimately involved in the Performance Trust negotiations lied to their faces and told them **"absolutely none"**.

- January 31, 2017 - Messrs. Kirchner, Berkoff, and Park, who each was identified to Hunt by Performance Trust, abruptly resigned their employment from Performance Trust;

- February 7/8, 2017 - During a dinner with Marc DeFife, Chris Hunt and Scott Campbell in Florida, Jennings discusses in great detail his plans to hire employees from Performance Trust and elsewhere.  Even though each one of Marc, Chris and Scott were aware of the NDA in place, none of them said a word to Jennings about its existence.

- March 6, 2017 -- Kirchner, Berkoff, and Park officially commenced employment with Hunt;

- March 7, 2017 -- Kirchner, Berkoff, and Park contacted Performance Trust's customers;

- March 8, 2017 -- Hunt had a meeting with a customer of Performance Trust.

- March 16, 2017 – Performance Trust files the Performance Trust Litigation and Jennings, for the very first time, sees the NDA.  Kara brazenly tells Jennings and others that **"despite Hunt's blatant breach of the NDA, Courts are nevertheless loath to stop employees such as Kirchner, Berkoff, and Park from working."**  She ends up being dead wrong.  Having found himself in the middle of a mess that was deliberately concealed from him so that he could unwittingly violate the NDA while Hunt could claim "deniability", Jennings excuses himself from Hunt's defense of the Preferred Trust Litigation.

123.   On March 16, 2017, a Hearing in the Performance Trust Litigation was held before Judge Barry R. Ostrager in the New York State Supreme Court, during which the following statements were made by Hunt's Counsel, Jeremy A. Cohen, during a conversation with Judge Ostrager concerning Jennings' role in the building out of Hunt's Broker Dealer:

```
MR.   COHEN:   So, here's the background here; There's no
nefarious scheme to steal their employees.
```

What happened was, in January of 2016, which is nine months before this confidentiality agreement and the consideration of investigating capital in Performance Trust, Hunt, my client, was looking to build out its broker/dealer business, so that was in the January, 2016 as described in Paragraph 12 of the affidavit of James C. Hunt, which I will hand up. They filed applications to various regulatory authorities in January, March, again, all before Performance Trust was even an issue. They had this planned to build a broker/dealer business.

In the Fall of 2016, Performance Trust comes on the scene, solicits us, and says we're trying to raise capital. Why don't you take a look? There were discussions. The confidentiality agreement was signed, but by December 2nd of 2016 the discussions were terminated, and they're terminated because there were certain things that we asked for that they just weren't going to provide, so that was December 2nd, 2016.

It's more than a month later that as part of this pre-existing broker/dealer plan that went back to January, Hunt hired a guy named Bill Jennings. **He's someone they hired specifically to grow that broker/dealer business.** That was January 9, 2017.

**Obviously, given the timing of Jennings' hire, he was not involved with the Performance Trust negotiations, the due diligence, anything. He has nothing to do with the Performance Trust people. He came along only after it was terminate**d.

**Jennings put a team together to build out the broker/dealer**, hired a guy name Brian Pereira. That was January 16th, also obviously, not involved with Performance Trust. **They were essentially given autonomy to build out the broker/dealer and assemble a team,** didn't have the involvement of anybody who is involved in the Performance Trust negotiations, the due diligence review, accepted into the highest levels of supervisory; yes, go do what you are doing. I**t was Jennings and Pereira who actually hired the three employees. They have no idea about the confidentiality agreement. They knew the. employees. They have no idea about the Performance Trust's due diligence. They knew about these employees because they had a prior relationship with them. Jennings and Pereira both had a long term prior relationship with the most senior of those employees, a guy by the name of Kirchner.**

> **THE COURT: So, the left hand didn't know what the right hand was doing, that's your position?**

MR. COHEN: **No, no, that's not what happened because the left hand wasn't on the scene at that point in time that Performance Trust was under scrutiny for consideration.** They were hired later, and they hired these guys not because of anything to do with the due diligence, but because they had a prior relationship. Jennings and Pereira knew Kirchner going back 18, 17 years, and in their affidavits which I handed up Kirchner describes the prior relationship in Paragraph 13.

Sol Berkoff is another employee described at Paragraph 12, and Brian Pereira at paragraph 8 of his.

**As I said, these people, Jennings and Pereira, who were not even at Hunt at the time of the Performance Trust negotiations, so they obviously didn't have any information, didn't learn anything from that process.**

So, what's really going on here, "Judge, is that Performance Trust is upset after conducting due diligence and negotiating terms Hunt decided not to make an investment, and they're actually suing for $50 million, which is coincidentally the exact amount they wanted Hunt to invest in their company. They're just a jilted quarter, and that's why they brought this claim. It is, quite frankly, a sham.

124.   Once Hunt was forced to disclose to Jennings the existence of the NDA with Performance Trust, on March 24, 2016, Hunt then disclosed to Jennings that an NDA existed with another competitor, KGS, from whom Hunt knew Jennings was recruiting.

125.   During a subsequent courtroom hearing in the Performance Trust Litigation, Chris Hunt took the stand and under oath testified that, **"Bill [Jennings] never knew about the NDA with Performance Trust."**  Immediately, the Judge called for a side bar and advised Chris Hunt to settle with Performance Trust as Performance Trust was seeking $50 million in revenues because Messrs. Kirchner, Berkoff, and Park were revenue-generators to the tune of $25 million, plus the harm caused to Performance Trust through Hunt's bad acts.

126.    On or about March 27, 2017, Jennings requested from Marc DeFife a list of all of the NDA's that the firm has outstanding to make sure he was not "unwittingly" violating any other NDA's.

127.    Once the dust settled on the initial filings of the Performance Trust Litigation, Hunt had to deal with the havoc it wreaked upon the three poached employees – Messrs. Kirchner, Berkoff, and Park.

128.    On or about March 30, 2017, in light of the conversations Messrs. Kirchner, Berkoff, and Park had with DeFife on January 20, 2017 where, in response to whether there were any legal restrictions on Hunt's ability to solicit and employ them away from Performance Trust, to which DeFife responded, "absolutely none", Messrs. Kirchner, Berkoff, and Park met with Jennings and demanded that they be paid *$500,000* in damages to settle potential lawsuits because Marc DeFife lied to them before they left their jobs at Performance Trust.

129.    Ultimately, Hunt paid a total of $1,000,000 to Kirchner and Berkoff, ($500,000 to each).

130.    This $1,000,000 was accounted for in Jennings' expense numbers and, ironically, would later be used by Hunt against Jennings in a pretext that Jennings exceeded budgeted expenses in his business.

131.    On or about April 3, 2017, Jennings received a call from Kara and Marc DeFife informing him that Performance Trust agreed to settle with Hunt for a whopping $9.5 million. Ultimately, Hunt was able to push the final number down to a painful $8 million settlement figure.

132.    Weeks later, on or about July 19, 2017, Jennings received a call from Marc DeFife about splitting the Performance Trust legal bill with Chris Hunt.

133.    Needless to say, Jennings was bothered by this request because he was told that the $8 million loss was explained to the Board as Chris Hunt's fault (he took the fall for Kara Harchuck) so Jennings was unsure why this was now coming up weeks later.

134.    Jennings was also told that the insurance carrier would pay for a majority of the settlement but that never happened.  It came out of Jennings' department's numbers.

### Jennings Exceeds All Expectations and Builds A Self-Sustaining Broker/Dealer Business In Record Time

135.    By October 2017, within five months from creating a business with no licenses, no employees, no offices, no revenues, and whose initiation onto the Street was plagued with lawsuits and accusations of wrongful poaching through actions of Hunt executives that were not only concealed from him but that resulted in $8,000,000 in fines – not to mention the significant reputational damage – Jennings had built a 30-person operation that had already generated more than $10+ million in revenues and was growing exponentially.  Jennings lamented about how well he would have done without Hunt's bad behavior.  Despite this, Jennings was well on his way of reaching Hunt's exaggerated target of Fifteen Million ($15,000,000) Million in revenues, which Jennings exceeded by year's end.

136.    Furthermore, by September 2017, according to Hunt Company's own presentation documents (prepared in respect of a third-party investment of "NewCo"), Hunt Company reported on its books a valuation of Jennings' nascent broker / dealer of $48.2 million (or a 5x multiple of revenue).

137.    Under Jennings' leadership, this was a dramatic increase from $13 million in April 2017, when HFS opened its doors for customer business.

138.    While Jennings was the mastermind behind the success of HFS, he had the assistance of ten (10) people that represent the nuts and bolts of his successful operation.

139.    With 25+ years' experience and as a manager of hundreds of people on Wall Street, Jennings understands that the greatest investment a fledgling broker-dealer business like HFS could make in its business is in keeping key employees happy and content – especially if the business has succeeded and continues to succeed on their watch.

140.    During the course of the first six months HFS was in business, Jennings helped to hire a core group of senior managers and experienced loyalists from across Wall Street and firmly put in place a sales team from his extensive rolodex.  But in order to keep them, they needed to be compensated in line with their efforts and, in this instance, resounding success.

141.    In this respect, on or around October 5, 2017, Jennings met with Chris Hunt, Marc DeFife and Scott Campbell to discuss an adjustment to the initial Ten Million ($10,000,000) Dollar annual minimum compensation budget that was allocated to Jennings and his key team members.[5]

142.    Indeed, the Management Agreement provided that

> **Initial Operating Expense Allocation**. Hunt shall make available to the Business an aggregate amount of up to $10,000,000 (the "*Initial Operating Expense Allocation*"), which *Initial Operating Expense Allocation* shall be used by the Business to fund the initial compensation expenses of the Business and Non-Compensation Expenses, in the reasonable discretion of Manager

---

[5] Scott Campbell was curiously put on the Management Committee without any discussion or consultation with Jennings, who was Manager of the business.  Scott Campbell's only qualification for such appointment was that he was Chris Hunt's college roommate and best friend.  Indeed, Campbell had zero fixed income experience.  Campbell repeatedly used to ask Jennings to teach him the mortgage business, so he could relay successes to Chris Hunt on HFS's behalf even though he had no idea of the context or facts about which he was speaking.  Chris Hunt also made Scott Campbell Head of Risk for HFS without proper licensing and without discussing or notifying Jennings.  Jennings was purposefully left off of this internal announcement to business heads by Hunt's General Counsel and brain trust behind the $8,000,000 Performance Trust disaster, Kara Harchuck.   The Head of Risk is one of the most important positions at a broker / dealer business.  It requires product experience and onsite duties, neither of which Campbell had.  Ultimately, Jennings convinced the Management Committee to switch Campbell's title to Head of Corporate Strategy, which minimized the exposure to HFS due to Campbell's lack of qualifications and licensure.

and in accordance with the Budget and the Business Plan. (Management Agreement § 4.1)

143.     During the meeting, each Chris, Scott and Marc agreed that while the original contemplation of the business as a start-up was a $10 million dollar compensation budget, this amount needed to be adjusted upward to reflect the success of HFS and to continue on the same positive trajectory, especially given that the employees were currently scheduled to receive below-market compensation given that the business was open only for six months.

144.     When Jennings was asked how much additional compensation was needed for the team, Jennings expressed "probably another $1.2 million."  Chris Hunt, Marc DeFife and Scott Campbell's reply was indisputably positive.  Scott Campbell stated, **"That's it?  Seems like a small price to pay for such quick success!"**

145.     During this meeting, it was agreed by Chris Hunt, Marc DeFife and Scott Campbell that if HFS were to hit the $15 million revenue number, Hunt would gladly pay the incremental compensation needed, especially because of the Performance Trust debacle that Hunt saddled Jennings with at the very beginning before HFS even opened for business.

146.     At the conclusion of the meeting, Jennings felt confident that the Hunt Executives understood the importance of keeping key people in their seats, especially at a new broker / dealer business that had no track record or goodwill reputation other than what those very people built into the foundation of the new business.

147.     Jennings expressed this to each Marc DeFife and Scott Campbell on numerous occasions, and during every weekly Management Committee call (held at 9:00 A.M. on every Monday morning) as well as reiterated that with respect to optics, stability and retention of Wall Street talent is the surest way to attract more talent in the short future.

148.    After his meeting with Chris Hunt, Scott Campbell and Marc DeFife, Jennings shared the good news of his agreement with management about the $15 million dollar revenue goal with several people, including Brian Pereira (Head of HFS' Structured Products Business), Bob Zimmel (HFS' FINOP), David Markey (HFS' CAO) and John Nielsen (HFS' General Counsel).

### Hunt's Bait-and-Switch Tactics After HFS Proves Successful

149.    Over the weeks following this October 5, 2017 meeting, Jennings and the Management Committee, as well as Jennings' senior employees and other operations personnel, had numerous conversations about HFS having excess money to pay people to keep employees in their seats for 2018 if HFS "would hit its $15 million dollar number."

150.    Jennings was told numerous times by the Management Committee that the incremental compensation would be blessed from the Management Committee and received Dory Sarney's (HFS' Head of Human resources) approval to pay people in early January 2018.

151.    Amazingly, by around mid-December, 2017, HFS exceeded its budgeted $15 million dollar benchmark, 40% of which was generated personally by Jennings and recorded in the management trading book.

152.    Consequently, HFS had met its benchmark for receiving an additional $1.2 million dollars in compensation expense for the key employees directly responsible for achieving the $15 million dollar goal.

153.    Following HFS' achievement of hitting and exceeding its $15 million dollar revenue benchmark, to ensure that the lines of communication were open between (i) HFS; and (ii) Chris Hunt, Marc DeFife and Scott Campbell on behalf of Hunt concerning Hunt's agreement to increase the compensation budget by $1.2 million dollars, Jennings began including the additional $1.2 million dollars in compensation on the spreadsheets that were submitted to

the Management Committee and discussed with HR concerning 2017 compensation for newly-minted HFS employees.

154.    Unfortunately for Jennings, however, Hunt's consistency for short-sighted greed trumped any unequivocal specific promises concerning accommodating Jennings request for incremental compensation for his key people.

155.    The short sightedness is indeed illustrated in the term "his people;" The incremental compensation Jennings was actually seeking was for "Hunt's people".

156.    Following Jennings' refusal to lie and cover for the Performance Trust $8,000,000 dollar mess, Hunt dealt with Jennings as if they were on opposite teams.

157.    In the weeks following, Jennings attempted to work with Hunt executives on resolving the compensation budget shortfall caused by Hunt's breach of express representations made to Jennings.

158.    On or around January 10, 2018, Jennings met with Scott Campbell and Marc DeFife, for now a fifth time, to once again review the compensation numbers for HFS and Jennings and other HFS employees.

159.    During this meeting, both Scott Campbell and Marc DeFife admitted that the current compensation budget without the increment was "low" and, with the exception of one employee (i.e., Brian Pereira) there was concern whether HFS would be able to keep key talent "in their seats" especially, as Marc DeFife and Scott Campbell observed, **"given how little we are paying these people."**

160.    At the end of the meeting Jennings emailed both Scott Campbell and Marc DeFife the compensation numbers, which were reviewed and agreed upon at the meeting.

161. On January 19, 2018, Scott Campbell emailed Jennings concerning their ongoing discussions regarding HFS' compensation budget.

162. In his email, Campbell confirms the Management Committee's agreement to increase the $10,000,000 dollar compensation budget but admits that: **"We had discussed being over a couple of hundred grand. Can you take a look. Lets chat Monday [at the Management Committee Meeting]. Best, Scott."**

163. At no time prior to the announcement of bonuses to the HFS staff did anyone voice disagreement with Jennings' recommendations to allocate a bonus pool to the employees.

164. It is important to note that at no time was Jennings' contractual bonus of $1,500,000, considered for increase. Jennings simply asked for more bonus money for the employees.

165. Said differently, any agreed upon excess of a bonus pool above the contemplated Ten million ($10,000,000) Dollar compensation budget would be allocated to new hires to incentivize and retain important contributors.

166. Campbell's written statements are incredulous and made in bad faith, especially since both he and Marc DeFife have had multiple conversations with Jennings on this topic and have received written confirmation of their numerous agreements to increase the budget by $1.2 million dollars over the past several weeks and months, without any objection.

167. Attached to Campbell's email was a side-by-side budget for compensation expense from Steve Debarra in Corporate Budgeting.

168. Jennings replied to Campbell that his recollection was not accurate.

169. Jennings then spoke to DeFife and recounted Campbell's "memory" of the agreement to increase the Initial Expense Allocation.

170.    DeFife responded, "**Scott must have been drinking Friday night with Chris because the $1.2mm is exactly what we've been talking about for months"**.

171.    Indeed, Hunt waited to about-face and object until *after* Jennings paid all HFS employees in accordance with the promised increased budget.  Astonishingly and in bad faith, this objection came only after Jennings cleared it with both DeFife and Campbell as well as Dori Sarney, his HR contact who reports to Kara Harchuck.

172.    Until the money was paid out in late February, 2018, Jennings did place on all compensation sheets for the HFS employees, **"compensation is still subject to Hunt's final approval"**.

173.    Realizing Hunt's bait-and-switch, Jennings sent the following note to Marc DeFife and Scott Campbell:

> ... Just so we are all on the same page with the same recollection of facts like we have discussed many times for the past 3 months, my job was to get to 15mm in revs ("just get to 15mm and the rest will be fine") so that we could pay out 4.2mm in total bonuses (2.7mm fit 30 people and 1.5 to me) which was in addition to 5+mm in salaries.  The rest the firm would figure it out as we all discussed and agreed.  Part of these discussions included all of the self-inflicted costs and loss of talent but licked our wounds and we powered through it to achieve our goals which we did.   The only change to that at year end was we came in at 15.2mm revenues instead of 15mm and needed to pay out a 4.5mm pool instead of 4.2mm bc we paid our top sales person in Rye another 100k and Periera another 200k bc one quit after I paid him and the other expressed incredible dissatisfaction with his comp.
>
> Also to be clear, I haven't seen or spoken with DeBaraa in months about forecasting bc his last forecast in the fall was deemed incomplete by all of us since we didn't have clarity on startup, legal expenses etc so our sole focus was to make 15mm in revenues.
>
> So I'm not sure what the agenda is that would cause you to email me last night and again this morning, but I'm free all day to discuss it as I am everyday and night so give me a call.  Tx

174.     Accordingly, Jennings immediately responded to Campbell's email pointing out to Campbell that his statements were not accurate and reminded Campbell of Hunt's promise to increase the compensation budget.

175.     By mid-January 2018, more than four months after Chris Hunt, Scott Campbell and Marc DeFife assured Jennings that they would increase HFS' compensation budget by $1.2 million dollars, and, of course, only after HFS hit the $15 million dollar revenue goal, which number was climbing higher off the springboard built by Jennings that is now HFS, Jennings was told by Chris and Scott that, "It [i.e., the incremental compensation] does not look like it's going to happen."

176.     Jennings was disappointed upon hearing the news of the reneging of specific promises and representations regarding Hunt's agreement to increase the budgeted compensation allowance for HFS employees.

177.     This was particularly hurtful to Jennings, who did not just meet the $15 million dollar revenue goal, but exceeded it.

178.     Jennings pointed out to Marc DeFife and Scott Campbell that earlier in 2017, Hunt paid $8 million in a quick and ugly settlement to Performance Trust, yet would not fund a relatively small increase to the compensation pool for all sent the wrong message to the HFS employees and to future recruits.

179.     In response, Marc and Scott agreed, that "it's absurd."

***Jennings' Employment is Terminated Without Cause in violation of the Employment and Management Agreements***

180.     Once Jennings had built the infrastructure of a formidable and profitable broker / dealer business, building out offices, acquiring licenses and hiring forty-five (45) seasoned and

highly-sought professionals in the financial services business, out of the blue, on January 28, 2018, Hunt sought to re-trade Jennings.

181.    In bad faith, Hunt sought to re-trade the express written promises that Hunt made to Jennings in order to induce him to re-enter the financial services sector and expend his full resources, acumen, contacts, energies, knowledge and experience and to force Jennings to re-negotiate his Employment Agreement under the threat of not paying him his $1,500,000 contractually earned and accrued bonus compensation.

182.    In bad faith, Hunt delivered an ultimatum; if Jennings refused to renegotiate the valid, unambiguous contract he spent over a month (and expended $100,000 in legal fees) negotiating just a year earlier, then Hunt would get rid of Jennings without any exposure under the valid binding agreements in place by either asking for Jennings' resignation, or drumming up some justification for terminating his employment for "Cause", even though Hunt knew no such justification existed.

183.    As described below, once Jennings refused to re-trade the terms of his Employment Agreement, Hunt shamelessly did an about face and terminated Jennings' employment without "Cause."

184.    In hindsight, it is clear that Hunt schemed to jettison Jennings once he built out the broker / dealer platform.

185.    Indeed, Hunt used material incentives it had no intention of honoring such as liberal autonomy to run the business, tens of millions of dollars in equity upside, and a 7-year guarantee of employment in order to induce Jennings to exit retirement and invest his time, resources and reputation into building a broker / dealer from scratch.

*Bad Faith Attempt #1*

186.     Despite HFS' indisputable performance success, exceeding expectations as supported by the numerous Management Committee Meeting Memoranda, on January 29, 2018, Hunt unilaterally revised the terms and conditions of Jennings' compensation terms in material breach of the Employment Agreement and the Management Agreement.

187.     Specifically, as a new condition precedent to receiving his contractual minimum guaranteed $1,500,000 bonus compensation, Hunt required Jennings to execute a document entitled, **"Management Committee Memorandum, Re: Jennings Compensation for 2017"** (Exhibit "G") that misrepresents the events and discussions that Jennings and HFS had with Hunt (and its executives), in order to be used by Hunt to wrongfully undo its contractual agreements with Jennings.

188.     The January 29, 2018 Memorandum that was signed only by Scott Campbell (and specifically not Marc DeFife) on behalf of "HFS Management Committee" called for Jennings' signature as well to confirm that, "By executing this memo, Bill Jennings agrees to its contents in his individual capacity as well as his capacity as Management Committee member."

189.     Upon receipt of the letter, Jennings asked HFS' General Counsel, John Nielsen, to join him for a call with Scott Campbell to discuss the memorandum.

190.     During the telephone call, Campbell tried hard to convince Jennings to sign the Memorandum.

191.     Campbell reiterated, as he had done so many times before since October, "Bill you have done a great job and we want to pay you even more than your agreement."

192.     Jennings told Scott Campbell that he is not in agreement with the letter nor is he signing it.

193.    In response, Campbell persisted "Bill, we would like to pay you even more than what you are owed so if you don't like the letter then send back to me what you are comfortable signing."

194.    Following Campbell's suggestion, on January 31, 2018, Jennings emailed DeFife and Campbell the following response to the January 29, 2018 Memorandum:

> Per your request
>
> January 31, 2018 at 12:49 PM
>
> Management Committee Memorandum
>
> 1. According to Bill Jennings' Employment Agreement, Jennings could decide, in his sole discretion, to be paid a $1.5 million bonus for 2017 so long as HFS did not exceed the Initial Operating Expense Allocation.
>
> 2. In October 2017, the Management Committee agreed to exceed the agreed upon thresholds in the Management Agreement for 2017 in regards to total expenditures and bonus requests (i.e., the Initial Non-Compensation Expense Amount and the Initial Operating Expense Allocation). In recognition of these agreements and Jennings's merit and performance, the Management Committee has also agreed that HFS will pay Jennings the full 2017 bonus. Accordingly, HFS will pay the $1.5 million 2017 bonus, subject to the 25% hold-back per the Management Agreement, to Jennings on or prior to February 1, 2018.
>
> 3. The decision by the Management Committee to allow HFS to exceed the Initial Non–Compensation Expense Amount and the Initial Operating Expense Allocation does not create an amendment to the Management Agreement or Employment Agreement and does not create any obligation with respect to futures years or bonus amounts.
>
> Regards
>
> Bill

### Bad Faith Attempt #2

195.    Realizing that Jennings' responses to the January 29, 2018 Memo were not only valid but rebut any implication that Jennings acted at all contrary to the terms and conditions of

the Employment and Management Agreements, Hunt had to embark on a different strategy to support his bad faith breach.

196.    On the morning of Thursday, February 1, 2018, the day that Hunt was supposed to pay Jennings' his contractual bonus compensation, Jennings spoke to DeFife at 7:15AM and told him that if **"Hunt does not want to pay the overage we discussed, then I will rework the numbers.  So, let me know what you guys want to do."**

197.    After not hearing back from DeFife, Jennings attempted to call each Chris Hunt, Scott Campbell and Marc DeFife to follow-up on his suggestion of reworking the numbers, but to no avail.

198.    Thereafter, Jennings revised the bonus pool.

199.    Specifically, on February 1, 2018, Jennings sent an email to Campbell, DeFife and Chris Hunt stating:

> Marc and Scott –
>
> I have tried to call you a few times today, but I guess you are busy.
>
> If you have changed your mind about saying the group in excess of our 10mm compensation allocation limit, per my agreement here are our new comp numbers including my compensation (which I preserve the prescribed compensation limits) which I'm permitted to pay at my sole discretion per my employment agreement..."

200.    Attached to Jennings' email was a revision of the side-by-side person-by-person compensation expense pool that Campbell sent Jennings on January 19, 2018:



Marc and Scott —

I have tried to call you a few times today, but I guess you are busy.
If you have changed your mind about paying the group in excess of our 10mm compensation allocation limit,
per my agreement, here are our new comp numbers including my compensation (which preserve the prescribed compensation limits)
which I'm permitted to pay at my sole discretion per my employment agreement.

| Employee | Bonus | Total Comp | New Bonus |
|---|---|---|---|
| Bauer, Scott A. | 50,000 | | 50,000 |
| Bernard, Brian | 150,000 | | |
| Berkoff, Solomon P. | 150,000 | | 0 |
| Chiappetta, Lorenzo M. | 10,000 | | 10,000 |
| Comerford, Michael B. | | | |
| Cooney, Kevin M. | 100,000 | | 0 |
| Crowley III, John J. | 50,000 | | 50,000 |
| Dubas, Robert L. | | | |
| Jennings, Bill | 1,500,000 | | 1,500,000 |
| Hebert, Valerie O. | 100,000 | | 100,000 |
| Heher, Gregory J. | | | |
| Jimmy Parsley | | | |
| Kirchner, Steven A. | 150,000 | | 0 |
| Markey, David J. | 50,000 | | 50,000 |
| Menig, Keith N. | 60,000 | | 40,000 |
| Mitchell, William J. | 25,000 | | 25,000 |
| Murray Jr., Roderick J. | 100,000 | | 100,000 |
| O'Hara, Connor M. | | | |
| Oricoli, Stephen A. | 200,000 | | 100,000 |
| Paradiso, Alfred | 40,000 | | 40,000 |
| Pereira, Pradeep B. | 900,000 | | 520,000 |
| Piu, Raffaele | | | |
| Polen, Barry N. | 300,000 | | 300,000 |
| Prada-O'Reilly, Shirley | 40,000 | | 40,000 |
| Riether III, Charles J. | 30,000 | | 30,000 |
| Su, Nan | | | |
| Sullivan, Christopher W. | 15,000 | | 0 |
| Zimmel, Robert P. | 75,000 | | 75,000 |

201.    Disappointingly and in bad faith, neither Campbell, nor DeFife nor Chris Hunt ever responded to Jennings' email.

202.    Instead, at 4:00 P.M. that afternoon on February 1, 2018, DeFife traveled from Hunt's New York City office to Rye Brook to speak with Jennings.

203.    When DeFife arrived, Jennings saw that DeFife was visibly upset.

204.    When Jennings entered DeFife's office, DeFife began to sob uncontrollably.

205.    Trying to regain his composure, DeFife apologizes to Jennings saying, "I'm sorry that I had you come here and that I don't know what's going on."

206.    Jennings responded by telling DeFife, "I get it.  You have a job to do and your own ass to cover."

207.    DeFife then asked Jennings to come with him to the Conference Room where they were joined telephonically by Scott Campbell and Ann Patrick, Hunt's Head of HR (who reports to Kara Harchuck).

208.    Jennings was shocked that Hunt and Campbell would send DeFife to do their dirty work, especially since DeFife at one time benefited from the very work ethic they were punishing him for - rewarding loyal employees based on merit ad contribution.   DeFife had previously swore allegiance to Jennings following years at Jefferies where Jennings paid DeFife handsomely, above market.   Jennings also promoted DeFife to Head of the Midwest Region before he was even thirty (30) years old, which at the time was unheard-of at Jefferies or anyone else on Wall Street.

209.    Once in the Conference Room, Jennings was handed the following correspondence entitled, "Management Agreement and Employment Agreement".

210.    In the February 1, 2018 Letter (Exhibit "H"), Hunt attempts to demand of Jennings that Jennings attempted to resign his employment for "Good Reason."

211.    Jennings adamantly vocalized his objections to any implication that he even considered resigning.

212.    Accordingly, the implication by Hunt that Jennings sought to resign is a bold-faced pretext to terminate Jennings' employment without "Cause" and to obviate Hunt's significant financial obligations to Jennings under such termination without Cause provision.

213.    If Hunt truly had "Cause" to terminate Jennings' employment, then it would not be necessary for Jennings' to resign.

214.    However, if Jennings were to resign without good reason, Hunt would be able to exit Jennings without breaching his agreement or incurring a $71,800,000 liability.

215.    Specifically, the February 1, 2018 correspondence stated:

Bill:

As you know, we have been attempting to work with you on your compensation request for your bonus, as well as the 2017 Budget (including the Initial Operating Expense Allocation and Initial Non-

Compensation Expense Amount). In October, we discussed a potential resolution to the over-Budget issues, but those numbers continued to increase over time, and a final approval was never reached. On January 30, 2018, we presented you with a final offer, which you refused. You have threatened to quit if we fail to pay you a $1,500,000 Bonus that you believe is owed to you under your Employment Agreement. However, pursuant to your Employment Agreement, "for the avoidance of doubt, no Bonus shall be paid in respect of a given Fiscal Year in which there are not sufficient Revenues (or with respect to Fiscal Year 2017, Initial Operating Expense Allocation) to accommodate the payment of such Bonus (together with all other Aggregate Compensation for such Fiscal Year} within the Compensation Percentage for such Fiscal Year." As such, no Bonus is due to you under your Employment Agreement. Over the past weeks and months, you have threatened to quit multiple times, in each instance, to exert pressure on Hunt in an attempt to extract a favorable outcome for your interests. As with this latest threat, your actions and threats have repeatedly put your own interests ahead of those of the Business, demonstrating a lack of good faith, lack of loyalty and lack of care to the Business. We do not believe you have (now or in the past) Good Reason to resign, and as you know the Agreements do not permit you to resign without Good Reason. However, if you would like to resign without Good Reason, we would be prepared to accept that resignation as of today. We reserve all rights under the Agreements, including to obtain a release of claims in connection with this matter.

If, however, you do not choose to leave voluntarily, we are putting you on notice today that we have good Cause to terminate you pursuant to your Employment Agreement.

You have materially breached the Management Agreement and Employment Agreement (the "Agreements"). Contrary to the Agreements, without limitation, you have failed to:

1. Operate the Business in a manner materially consistent with, and/or stay within, the Budget, Initial Operating Expense Allocation and Non-Compensation Expense Amount;

2. Obtain Management Committee approval prior to communicating compensation/bonus amounts to employees;

3. Obtain Management Committee's approval prior to setting the Allocation Percentages for each of the Executive Committee members and prior to communicating those percentages to them. Furthermore, you have failed to present the Committee with the full list of Executive Committee members and their Allocation Percentages for approval at all;

4. Include the Held-back Portion in the compensation figures presented to Executive Committee members. You also failed to

communicate to such Executive Committee members that those held-back portions are required, or how they work.

5. Present a Business Plan to the Management Committee for approval for 2018; Conduct yourself in a professional manner and adhere to all applicable Company rules, policies and procedures. You have repeatedly failed to use your reasonable best efforts to faithfully perform your responsibilities in a diligent, trustworthy, efficient and businesslike manner so as to advance the best interests of the Business.

If you fail to resign, subject to and in accordance with the terms of your Agreement, your termination for Cause will become effective in thirty (30) days from the date of this notice.

If you fail to resign, subject to and in accordance with the terms of your Agreement, your termination for Cause will become effective in thirty (30) days from the date of this notice.

We believe it is in the best interest of all parties to resolve this matter amicably.  We ask and expect that you no longer physically enter the office, attempt to remotely access our systems, or discuss this matter or the Business with other employees.

Please have your attorneys contact Kara Harchuck, at 312-799-3929.

216.    The inaccuracies in the February 1, 2018 letter are numerous and self-serving.

217.    Among them is the statement, "Over the past weeks and months, you have threatened to quit multiple times, in each instance, to exert pressure on Hunt in an attempt to extract a favorable outcome for your interests. As with this latest threat, your actions and threats have repeatedly put your own interests ahead of those of the Business, demonstrating a lack of good faith, lack of loyalty and lack of care to the Business."

218.    First, Jennings never threatened to quit.  Ever.

219.    Second, Jennings never put his own interests ahead of those of the business.

220.    In fact, the very nature of Hunt's purported contentions is that Jennings sought an increment in the compensation expense for his employees above the Initial Operating Expense Allocation in order to incentivize those hires responsible for the success of the "Business" to

remain "in their seats" and committed to HFS, especially since it was so difficult to recruit talent following the Performance Trust Litigation.

221.   Furthermore, Hunt's agreement to pay $500,000 dollars each to Messrs. Kirchner and Berkoff (for a total of $1,000,000 dollars in addition to the $8,000,000 dollars paid to Performance Trust) as damages for the loss of compensation they suffered for the short 1+ month period that they were away from Performance Trust is indicative of the level, seniority and experience of the professionals that Jennings was selectively hiring in forming his key people to build Hunt's broker/dealer business.

222.   At the very least, such payment by Hunt is an admission as to the market value of the producers that were contributing to the sky-rocketing success that Hunt was enjoying under the leadership of Jennings and, furthermore an unwitting recognition that the Initial Operating Expense Allocation of $10,000,000 dollars was woefully inadequate for rewarding and retaining the level of executive the Jennings was hiring, unless, of course, Jennings would have only hired half the people he did (thereby generating significantly less revenues).

223.   Of course, now that Jennings had put into place to key players to run Hunt's well-oiled broker/dealer machine, Hunt could breach Jennings' agreements, terminate him without "Cause", and distribute the money that Jennings should have otherwise been paid to the key players Jennings wanted to retain, as well as pocket a few extra bucks for themselves.

224.   Indeed, if Jennings' had indeed intended to resign with "Good Reason", the Employment Agreement required him to "give the Company written notice of Executive's intention to resign his position with the Company within thirty (30) days after Executive has knowledge of, or should reasonably have had knowledge of, the occurrence of such event, such notice specifically referring to such event,

or (y) the Company cures the condition that constitutes Good Reason within thirty (30) days following the receipt of such notice." (Employment Agreement, § 3.4(c)).  Neither of those contingencies occurred.

225.    Another inaccuracy among many is Hunt's contention that "no Bonus is due to [Jennings] under [the] Employment Agreement" because "pursuant to your Employment Agreement, "for the avoidance of doubt, no Bonus shall be paid in respect of a given Fiscal Year in which there are not sufficient Revenues (or with respect to Fiscal Year 2017, Initial Operating Expense Allocation) to accommodate the payment of such Bonus (together with all other Aggregate Compensation for such Fiscal Year} within the Compensation Percentage for such Fiscal Year" is misplaced.

226.    Indeed, contrary to this contention, Hunt had sufficient revenues to pay Jennings his contractual bonus compensation for 2017, and, in fact, in an email dated January 9, 2018, Hunt's Human Resources Director, Rosana Aroche (who reports to Kara Harchuck) confirmed to Jennings that Hunt already **"adjusted your 2017 bonus so the total 2017 compensation paid is $2M."**

227.    In further support of Jennings' contract entitlement to the $500,000 salary and $1,500,000 bonus for 2017, Aroche also sent to Jennings a screenshot of the payment entry to Jennings within Hunts' payroll record system thus confirming to Jennings' his earned bonus compensation for 2017.



228. Other inconsistencies in the February 1, 2018 Letter concerns Hunts' incredulous accusations that Jennings did not fully communicate with the Management Committee.

229. The February 1st Letter uses accusations such as, "you have failed to present the Committee" or "You also failed to communicate to such Executive Committee members".

230. First, Jennings always communicated with the members of the Management Committee and kept all necessary persons apprised and involved at all times.

231. Jennings had conducted weekly Monday morning calls with the Management Committee and reviewed all aspects of the business on each call.

232. Furthermore, Jennings always acted in a most professional and transparent manner above and beyond what was required of him according to the Management Agreement, which did not require Jennings to be micromanaged.

233.    For example, the Management Agreement conferred Jennings broad discretion over his duties and responsibilities (which ultimately proved lucrative to Hunt, meeting all budgeted expectations, and then some:  "Manager shall, in the *good-faith exercise of his business judgment* conduct and direct the day-to-day affairs of the Business in accordance with the Budget and the Business Plan. Manager shall keep the Management Committee *generally appraised* of material matters relating to the day-to-day conduct of the Business and shall provide such other information and general reporting to the Management Committee as the Management Committee may reasonably request from time to time."

234.    Finally, for Hunt to accuse Jennings of not properly communicating with them concerning "imperative facts and decisions" is unfounded.

235.    Consequently, by Thursday, February 1, 2018, Jennings' employment was terminated without notice, and by its terms, Hunt breached the Employment Agreement as it fails to satisfy any of the definitions of "Cause" under the Employment Agreement.

236.    Finally, Hunt failed to provide Jennings any opportunity to cure the purported Cause as required in the Employment Agreement.

237.    Furthermore, not only has Hunt failed to provide any opportunity for Jennings to cure any purported "Cause"; even if it did, Hunt's actions in the days and weeks immediately following the February 1st Notice completely frustrated Jennings' ability to conduct any duties and/or responsibilities under either the management Agreement or Employment Agreement, thus rendering any cure opportunity futile.

238.    Moreover, illustrative of the futility of the "cure" notion is Jennings' willingness to revise the compensation budget, even before he was provided the February 1, 2018 Letter.

239.   Notwithstanding the futility of attempting to cure an action (i.e., the request to increase the Initial Operating Expense Allocation) which is not a "Cause" violation of the agreement but is an action that was agreed and supported by the Management Committee (who is now engaging in bait-and-switch tactics only after HFS hit its $15 million revenue target), Jennings decided to err on the side of caution and relent by revising the compensation numbers for HFS employees back to the original $10 million dollar budget, despite Hunt's commitment to the contrary.

240.   Disappointingly, neither Campbell, nor DeFife nor Chris Hunt ever responded to Jennings' communication.

241.   Instead, rather than work with Jennings to resolve what is - by any objective measure in Wall Street's broker/ dealer business - a minor administrative matter, Hunt immediately (the afternoon of February 1, 2018) froze Jennings out of his role, duties and responsibilities by shutting down all of Jennings' access to his email account and his Bloomberg account.



(screenshot of being denied access)

242.    Hunt's course of action literally moments after Jennings' sent the above email is illustrative of Hunt's bad faith motive to drum up "Cause" to get out of Jennings' unambiguous agreements at all costs.  After all, it was easy for them.  They had just attempted to do the same thing with Performance Trust.

243.    Hunt's conduct makes it apparent that Hunt has little to no regard for the contracts it enters into with parties who believe they are entering into binding contracts at arms' length under the protections of the covenants of good faith and fair dealing.

244.    In the hours and days following the February 1st Memorandum, Hunt made it abundantly clear through their actions that it had no intention honoring Jennings' agreements and

that it was going to do everything it could to cause Hunt to walk away from his contractual rights and entitlements.

245.    Beginning with shutting down Jennings' email and Bloomberg access, the very next day, Friday, February 2, 2018, Hunt stripped Jennings of his title of President of HFS in a very public display intended to embarrass and intimidate Jennings.

246.    Specifically, at 2:00 P.M. on Friday, February 2, 2018 Chris Hunt, Scott Campbell and Marc DeFife called all of the employees of HFS into the conference room on the trading floor at HFS headquarters (with a dial-in for the offsite regions) to inform HFS employees that "HFS is making some changes and that Marc and Scott are Co-Presidents and that its business as usual."

247.    Importantly, at the time, Jennings was the FINRA-registered Series 24 supervisor.

248.    In furtherance of Hunt's termination of Jennings' employment without "Cause" (and by operation of contract, termination of the Management Agreement), over the following weekend, February 3-4, 2018, Hunt instructed Jennings not to return to HFS' offices.

249.    This instruction was delivered by Hunt's outside counsel.

250.    Jennings has suffered damages as a consequence of Defendants' breach of the Employment Agreement and Management Agreement.

### DAMAGES STEMMING FROM FAILURE TO PAY 2017 PRIMARY BONUS

251.    As of December 31, 2017, Jennings was entitled to be paid his contractual bonus compensation, whether or not his employment was terminated for any reason.

252.    Pursuant to § 2.3 of the Employment Agreement:

> Executive will be eligible to receive an annual bonus for each year during the Employment Term, equal to an amount of up to $1,500,000, which bonus shall be determined by Executive in his sole discretion (each such bonus a "Primary Bonus")…

253.    As alleged herein, since it was determined by both Jennings, and confirmed by Hunt, that Jennings' Primary Bonus for 2017 is $1,500,000, such Primary Bonus is due and owing.

254.    The Defendant's utter failure to pay the earned compensation is willful as defined by New York's Labor Law.

255.    The Employment Agreement further provides that such Primary Bonus was due to be paid by February 1, 2018 in § 2.3 as follows:

> Except for the Held- Back Portion, any year's annual Bonus, to the extent earned, shall be paid in the following the calendar year but no later than February I of such following calendar year, subject to Executive's continued employment in good standing through (a) the date of payment, with respect to any Additional Bonus, or (b) the last day of the calendar year, with respect to any Primary Bonus.

256.    As of February 1, 2018, Jennings' had not been paid his $1,500,000 Primary Bonus in breach of the Employment Agreement.

257.    As further illustrative of Defendants' bad-faith, Defendants' attempted to force Jennings to re-trade the terms and conditions of his binding Employment Agreement by requiring Jennings' to agree to certain revised terms and conditions as a condition precedent to receiving his contractual Primary Bonus.

258.    All conditions precedent to earning and receiving the Primary Bonus has been met by Jennings and Defendants' attempt to tack on addition conditions is in breach of the duty of good faith and fair dealing.

259.    To date, Defendants' have willfully failed to pay to Jennings' his contractually earned compensation in breach of his agreements.

260.     The compensation owed to Jennings that Defendants willfully refuse to pay are considered "wages" as that term is defined under prevailing and controlling Labor Laws.

261.     As a consequence of Defendants willful failure to pay Jennings his wage compensation, Jennings is entitled to the unpaid wages, plus liquidated damages under prevailing Labor Law or an amount of at least **Three Million ($3,000,000) Dollars**.

### DAMAGES STEMMING FROM BREACH OF JENNINGS' 7-YEAR TERM EMPLOYMENT AGREEMENT

262.     According to the plain meaning of the terms of the Employment Agreement, Jennings' employment could not be terminated in the first seven years of his employment unless such termination was by the company for "Cause" or by Jennings for "Good Reason".

263.     Section 3.1 of the Employment Agreement provides that:

> 3.1 Termination Date. Either Party may terminate the Employment Term and Executive's employment hereunder for any reason or no reason, subject to the terms below (the effective date of separation being the "Termination Date"). **Notwithstanding the foregoing, prior to the seventh anniversary of the Launch Date, the Company may not terminate Executive's employment without Cause, and Executive may not resign (other than in the case of death or Disability) without Good Reason...**

264.     As of February 1, 2018, Defendants terminated Jennings' employment with "Cause" in breach of the Employment Agreement

265.     Accordingly, as a consequence of Defendants' breach of this provision alone, Jennings has been damaged in an amount to be determined at trial, which, as of the date of this Complaint is at least **Twelve Million ($12,000,000) Dollars**, which is comprised of the base salary and bonus payments due for the remainder of the term of the Employment Agreement.

### DAMAGES STEMMING FROM BREACH OF THE MANAGEMENT AGREEMENT

266.     In addition to damages under the Employment Agreement stemming from

Defendants' termination of Jennings' employment without "Cause", Jennings has also suffered damages due to Defendants' breach of the Management Agreement.

267.    By operation of breach of the Employment Agreement, Defendants breached the Management Agreement by terminating Jennings' employment without "Cause".

268.    Jennings suffered damages as a consequence of Defendants' breach of the Management Agreement.

269.    Specifically, the Management Agreement provided that Jennings would be entitled to certain distributions by HFS under the Management Agreement.

270.    The following model is illustrative of projections certified by Hunt assuming Hunt did not breach its Agreements with Jennings:



271.    Accordingly, based upon Jennings' entitlement to a portion of HFS' distribution, Jennings has been damaged by an amount of at least **Fifty-Eight Million Eight Hundred Thousand ($58,800,000) Dollars plus the value of Jennings' 17.5% equity in an amount to be determined.**

## CONCLUSION

272.     Defendants' unlawful behavior has continued unabated.

273.     Accordingly, Jennings brings the legal claims below to redress the damages suffered as a consequence of Defendants' unlawful actions.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendants:

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Employment Agreement)

274.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

275.     The Employment Agreement is a binding and enforceable contract that was supported by valid consideration.

276.     Jennings performed all of his obligations under that contract.

277.     Defendants breached that contract by terminating Jennings' employment without "Cause".

278.     As a result of Defendants' conduct, Plaintiff has suffered damages as detailed herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Management Agreement)

1.   Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

52

279.    The Management Agreement is a binding and enforceable contract that was supported by valid consideration.

280.    Jennings performed all of his obligations under that contract.

281.    Defendants breached that contract by terminating Jennings' employment without "Cause".

282.    As a result of Defendants' conduct, Plaintiff has suffered damages as detailed herein in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

283.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

284.    Plaintiff and Defendants had entered into agreements that are binding and enforceable and supported by valid consideration.

285.    Jennings performed all of his obligations under those agreements.

286.    Defendants breached the covenant of good faith and fair dealing inherent in the agreements by obviating the intention and purpose of the agreements as detailed herein.

287.    As a result of Defendants' conduct, Plaintiff has suffered damages as detailed herein in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Labor Law Violations)

288.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

289.    Defendants is an "employer," as that term is defined in applicable State Labor Laws.

290.     At all material times herein, Plaintiff was an "employee," as that term is defined in applicable State Labor Laws.

291.     Plaintiff willfully failed to properly, adequately and fully provide Plaintiff his earned "wages" as required under applicable State Labor Laws.

292.     Defendants are therefore liable to Plaintiff for damages incurred as a consequence of Defendants' Labor Law violations, which includes, but is not limited to costs, attorneys' fees and statutory liquidated damages.


## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Panel order the following relief in his favor against Defendants, jointly and severally:

I.      Ordering Defendants to pay Plaintiff treble damages under all appropriate counts;

II.      Ordering Defendants to indemnify Plaintiff where applicable for having to bring legal actions and/or defend against legal actions;

III.      Ordering Defendants to pay Plaintiff liquidated damages and attorneys' fees for Defendants' willful failure to pay Jennings earned wages;

IV.      Ordering Defendants to pay prejudgment interest, costs, punitive damages (where applicable) and attorneys' fees, where applicable; and

V.      Ordering such other and further relief to Plaintiff as this Court may deem just and proper.

Dated: New York, New York
February 27, 2018

Respectfully submitted,

**SACK & SACK, LLP**

*/s/ Jonathan Sack*

_____

By:      Jonathan S. Sack, Esq. (JSS-1835)

Attorneys for Plaintiff
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702