# EXHIBIT "A"

**From:** Chris Hunt <Chris.Hunt@HuntCompanies.com>
**Subject: Re: CONFIDENTIAL**
**Date:** November 6, 2016 at 5:32:58 PM EST
**To:** Bill Jennings <whjii@icloud.com>

Bill,

please see the attached back of the envelope model

Let me know what you think of the assumptions.   The starting capital includes the 10M salary pool.

The splits are 50% comp and 15% to other costs
.
The revenue to capital ratio starts at 50% and moves to about 150% which is a manual assumption in the model.

I have assumed a sale in 10 years at 5x net revenue

Since this is crude model it doesn't capture the crossover point for management equity exactly but its not way off either

🖨 *: Please consider the environment before printing this e-mail*

This e-mail, including all information contained therein and any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not an intended recipient, or an agent responsible for delivering it to an intended recipient, you have received this email in error. In such event, please immediately (i) notify the sender by reply email, (ii) do not review, copy, save, forward or print this email or any of its attachments, and (iii) delete and/or destroy this email and its attachments and all copies thereof. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, any e-mail sent in error, including all information contained therein and any attachments, by persons or entities other than the intended recipient is prohibited. Please visit our website at www.huntcompanies.com for important information about our privacy policies. For your protection, please do not transmit account information or instructions by e-mail or include account numbers, Social Security numbers, credit card numbers, passwords or other personal information.

On Nov 1, 2016, at 7:30 PM, Bill Jennings <whjii@icloud.com> wrote:

***EXTERNAL EMAIL***

# Review of Leadership:

**Person has built a billion dollar business from a scratch.   Branded/Changed a firm from a regional dealer to a full-service investment bank.  Ran FICC globally.
In first year at FICC, doubled revenues and while turning over 50% of global staff.**

# Hunt Securities Proposal

**Who are we - Hunt Securities is a full-service investment bank offering a uniquely integrated platform to institutional investors.  We provide institutional sales,**

trading and research in credit, mortgage backed securities and emerging marketsProducts traded including high yield, bank debt and special situations claims, agency mortgages, cmbs, CLO's, project loans, tax liens, military housing and emerging markets.

Our Investment Banking platform provides expertise in capital markets insight, restructuring and new issue mandates.

## Revenue Projections:

Note: At my last firm, I built from scratch, the one of if not the highest revenue per employee in the history of Wall St.  Each producer has a track record of 10-50mm in revenue.  If we assume 50% hc, we still get 100mm in revenues.

Year 1: 30-40mm on 50mm in Capital.  Revenues will start Feb 1st.  NO RAMP UP.
Year 2: 30-60mm on 70-100mm in Capital

## Synergies for Hunt Companies:

1. Leverage Hunt Mortgage Group.  Opportunities to originate, distribute, and sell FN DUS, Freddie K's and Ginnie Project Loans.  Sourcing of commercial loans and warehousing to create alternative financing

2. Leverage Cazenovia Creek.  Source tax liens in loan form as well as securtize and sell A/B structures.

3. Leverage Military Housing.  Securitize and sell Military Housing.

4. Leverage Real Estate Banking.  Will hire real estate investment banker to leverage internal real estate expertise as well as source new product and M&A.

5. Leverage Hunt Investment Mngt.  Opportunities to bring in third party capital in real estate space.

6. New In House Risk Management to help manage current Risk at Hunt Companies.

7. Known commodity and ability for Defife to be easily incorporated into BD

# 2 Year Commitment from Hunt Companies

## Location and Team - Most hires done before March 1st - NO RAMP

## Headquarters - RYE

RYE -   8 Sales people, 4 Traders, 2 Research,
LA -     3 Sales people
London - 3 Sales People and 1 Trader
(6 people called so far and 6 people in and they don't know they name of the firm - where I go they will go)

## Salary Pool: 10mm

Notes: Firm will need 10 hires to support business. Includes middle/back office, front office incl tech, compliance and legal.   Leadership has hired all support positions in past.

## Capital:  50mm (Capital grows at .5x revenues once 15% ROE generated on Capital for Hunt)

## Equity Split: 70% Hunt / 30% Employees (30% vests once 10mm in revenue achieved or 20% ROE generated on Capital for Hunt)

## Group Payout:  65% of Revenues

## Clients: hedge funds, mutual funds, insurance companies, money managers, pension funds, CLO Managers, trade claim creditors, and issuers.


## HUNT ALTERNATIVES FOR CAPITAL -

KGS ALPHA - Revenues have peaked with minimal growth since 2013, while headcount is up 30% and revenue per employee is down.  Leadership only has experience running Mortgage Sales and Trading business.  One trick pony in that main product offering of Mortgage Backed Securities.   Recently laid off 30 Credit Sales and Traders due to losses in business.  Hunt's investment will likely go towards rewarding Sr Mngt and used to go into other products in which Sr Mngt has no experience.  Very similar to what happened at Sandler O'Neil.

Goldman Sachs - buying at book value, but no way to leverage Hunt's companies or participate in leverage of building and owning a firm.

**Assumptions (highlighted):** Split — 50% Comp, 15% other cost · Hurdle 14% · 70% / 30% · Sale multiple 5 · implied multiple to book 2.52611476

| | Growth | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 1.1 | 30 | 50 | 75 | 100 | 110 | 121 | 133.1 | 146.41 | 161.051 | 177.1561 | 194.87171 |
| 50% Comp | | 15 | 25 | 37.5 | 50 | 55 | 60.5 | 66.55 | 73.205 | 80.5275 | 88.57805 | 97.435855 |
| 15% other cost | | 4.5 | 7.5 | 11.25 | 15 | 16.5 | 18.15 | 19.965 | 21.9615 | 24.15765 | 26.573415 | 29.2307565 |
| Net | | 11 | 18 | 26 | 35 | 39 | 42 | 47 | 51 | 56 | 62 | 68 |
| Capital | | 60 | 85.0 | 100.0 | 105.0 | 105.0 | 110.0 | 115.0 | 120.0 | 125.0 | 130.0 | 135.0 |
| ROE | | 17.50% | 20.59% | 26.25% | 33.33% | 36.67% | 38.50% | 40.51% | 42.70% | 45.09% | 47.70% | 50.52% |
| Additions | | 15 | 25 | 15 | 5 | 0 | 5 | 5 | 5 | 5 | 5 | 5 |
| Net Change | | 60 | 14.50 | (2.50) | (21.25) | (35.00) | (33.50) | (37.35) | (41.59) | (46.24) | (51.37) | (398.03) |
| Cummulative | | 60 | 74.50 | 72.00 | 50.75 | 15.75 | (17.75) | (55.10) | (96.69) | (142.93) | (194.30) | (592.33) |
| | | | | | | -7% | 6% | 13.52% | 19% | 22.26% | 25% | 34% |
| irr to hunt | | -60 | -14.5 | 2.5 | 21.25 | 35 | 33.5 | 37.35 | 41.59 | 46.24 | 51.37 | |
| 70% | | | | | | | | | 29.1095 | 32.37045 | 35.957495 | 278.621089 |
| 30% | | | | | | | | | 12.4755 | 13.87305 | 15.41035 | 119.409038 |
| Revenue/Capital | | 50% | 59% | 75% | 95% | 105% | 110% | 116% | 122% | 129% | 136% | 144% |

Hurdle 14% — Cummulative 33.792538%

irr to hunt — Cummulative 431.1585343 · 30.3507%

| | |
|---|---|
| Total MGT comp | 649.294405 |
| Total MGT resid | $161.17 |
| Total | $810.46 |

# EXHIBIT "B"

## CONFIDENTIALITY AGREEMENT

September 22, 2016

Hunt Companies, Inc.
980 N. Michigan Ave.
Suite 1150
Chicago, IL
60611

Ladies and Gentlemen:

In connection with your consideration of a possible transaction with Performance Trust Capital Partners, LLC and/or its affiliates (collectively, with such affiliates, the "Company"), the Company is prepared to make available to you certain information concerning the business, financial condition, operations, prospects, assets, liabilities and other confidential and proprietary information of the Company. In consideration for and as a condition to such information being furnished to you, you agree to treat any information concerning the Company (whether prepared by the Company, its advisors or otherwise and irrespective of the form of communication) that has been or will be furnished to you by or on behalf of the Company pursuant hereto (collectively referred to as the "Confidential Information") in accordance with the provisions of this letter agreement (this "Agreement"), and to take or abstain from taking certain other actions hereinafter set forth.

The term "Confidential Information" shall be deemed to include all notes, analyses, compilations, studies, interpretations or other documents or materials prepared by you or your Representatives (as defined below) which contain, reflect or are based upon, in whole or in part, such information furnished to you or your Representatives pursuant hereto. The term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by you or your Representatives in breach hereof, (ii) was within your possession prior to its being furnished to you by or on behalf of the Company pursuant hereto, provided that the source of such information was not known by you, after reasonable investigation, to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information, (iii) becomes available to you on a non-confidential basis from a source other than the Company or any of its Representatives, provided that such source is not known by you, after reasonable investigation, to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information, or (iv) has been or is subsequently independently conceived or developed by you without use of or reference to the Confidential Information.   For purposes hereof, "Representatives" shall mean a party's affiliates, directors, officers, employees, agents and advisors, and only upon prior written approval of the Company, any of your debt financing sources in connection with the possible transaction involving the Company. The term "person" as used in this Agreement shall be broadly interpreted to include the media and any corporation, partnership, group, individual or other entity.

You hereby agree that you and your Representatives shall use the Confidential Information solely for the purpose of evaluating a possible transaction between the Company and you and for no other purpose, that the Confidential Information will be kept confidential by you and your Representatives and that you and your Representatives will not disclose any of the Confidential Information to any third parties other than to the Company and its Representatives; provided that (i) you may make any disclosure of such information to which the Company gives its prior written consent and (ii) any of such information may be disclosed to your Representatives who have a need to know in respect of such information for the sole purpose of evaluating a possible transaction with the Company and, who, prior to receiving the Confidential Information are advised of this Agreement,  and agree to be bound by the terms hereof applicable to a Representative of yours to the same extent as if they were parties hereto. In any event, you shall be responsible for any breach of this Agreement by any of your Representatives and you agree, at your sole expense, to take all reasonable measures to restrain your Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.

In addition, you agree that, without the prior written consent of the Company, you and your Representatives will not disclose to any other person the fact that you are considering a possible transaction with the Company, that this Agreement exists, that the Confidential Information has been made available to you, that discussions or negotiations are taking place concerning a possible transaction involving the Company or any of the terms, conditions or other facts with respect thereto (including the status thereof), except in accordance with the procedures set forth in the immediately succeeding paragraph. Without limiting the generality of the foregoing, you further agree that you will not, directly or indirectly, share the Confidential Information with or enter into any agreement, arrangement or understanding, or any discussions which might lead to such agreement, arrangement or understanding, with any other person (other than your Representatives as permitted above), including other potential bidders and equity financing sources, regarding a possible transaction involving the Company without the prior written consent of the Company and only upon such person executing a confidentiality agreement in favor of the Company with terms and conditions consistent with this Agreement. Furthermore, you shall not enter into any agreement, arrangement or understanding, or any discussions which might lead to such agreement, arrangement or understanding, with any debt financing source which may reasonably be expected to limit, restrict, restrain or otherwise impair in any manner, directly or indirectly, the ability of such debt financing source to provide financing or other assistance to any other party considering a potential transaction with the Company.

You further agree that, unless otherwise instructed by the Company, all communications regarding the proposed transaction, requests for additional information, requests for facility tours or management meetings, and discussions or questions regarding procedures, will be submitted or directed only to Sagent Advisors, LLC, as advisor to the Company, and not to the Company nor any other Representative of the Company.

In the event that you or any of your Representatives are requested or required (by deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Confidential Information (including any matters referred to in the immediately preceding paragraph), you shall provide the Company with prompt written notice to the extent not legally prohibited of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Company, you or any of your Representatives are nonetheless, upon advice of your counsel, legally compelled to disclose Confidential Information or else stand liable for contempt or suffer other censure or penalty, you or your Representatives may, without liability hereunder, disclose only that portion of the Confidential Information which such counsel advises you is legally required to be disclosed, provided that you exercise your best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information, at the Company's sole expense.

If you decide that you do not wish to proceed with the possible transaction with the Company, you will promptly inform the Company of that decision. In that case, or at any time upon the request of the Company for any reason or for no reason, you will promptly destroy all Confidential Information (and all copies thereof) furnished to you or your Representatives by or on behalf of the Company pursuant hereto, including any materials prepared by you or your Representatives containing, based upon or reflecting Confidential Information, and you shall certify in writing that such destruction has occurred, provided that you and your Representatives may retain Confidential Information for your files as required by your respective record retention policies to comply with legal and/or regulatory requirements. Notwithstanding the destruction or retention of the Confidential Information, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations hereunder.

You understand and acknowledge that neither the Company nor any of its Representatives make any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information. You agree that neither the Company nor any of its Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the Confidential Information. Only those representations or warranties which are made in a final definitive agreement regarding the transactions contemplated hereby, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect. Neither the Company, Sagent Advisors, LLC or any of their respective representatives shall have any legal, fiduciary or other duty to any prospective or actual purchaser with respect to the manner in which any sale process is conducted. Furthermore, nothing contained in this Agreement nor the furnishing of Confidential Information shall

be construed as granting or conferring any rights by license or otherwise in any intellectual property of the Company, except for a limited right of use as specifically set forth herein. All right, title and interest in the Confidential Information shall remain with the Company.

In consideration of and as a condition to the Confidential Information being furnished to you, you hereby agree that, for a period of 2 years from the date hereof, neither you nor any of your affiliates will, directly or indirectly, solicit, interfere with or endeavor to entice away, offer to employ or employ any of the current officers or employees of the Company so long as you or your Representatives have knowledge that they are employed by the Company without obtaining the prior written consent of the Company.

In consideration of and as a condition to the Confidential Information being furnished to you, you hereby agree that, for a period of 2 years from the date hereof, neither you nor any of your Representatives on your behalf shall initiate or cause to be initiated or maintained any communication with any customer of, vendor or supplier that you or you Representatives know have a direct and ongoing relationship with the Company, the Confidential Information or any potential transaction with the Company without obtaining the prior written consent of the Company; provided, this shall not limit any contacts made by you or your Representative in respect of such persons in your ordinary course of business consistent with past practice.

You agree that unless and until a final definitive agreement regarding a transaction between the Company and you has been executed and delivered, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this Agreement except for the rights and obligations specifically agreed to herein. You further acknowledge and agree that the Company reserves the right, in its sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to a transaction between the Company and you, and to terminate discussions and negotiations with you at any time.

The Company reserves the right to assign all of its rights, powers and privileges under this Agreement (including, without limitation, the right to enforce all of the terms of this Agreement) to any person who enters into the transactions contemplated by this Agreement.

It is understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

It is further understood and agreed that any breach of this Agreement by you or any of your Representatives could result in irreparable harm to the Company, that money damages may not be a sufficient remedy for any such breach of this Agreement and that the Company may be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach and that neither you nor your Representatives shall oppose the granting of such relief. Such remedies shall not be deemed to be the exclusive remedies for a breach by you of this Agreement but shall be in addition to all other remedies available at law or equity to the Company. In the event of a breach of any obligations under this Agreement by you or your Representatives, you shall, immediately following the discovery of such breach, give notice to the Company of the nature of such breach and, upon consultation with the Company, take all necessary steps to limit the extent of such breach. You hereby agree to indemnify, defend and hold harmless the Company and its Representatives (the "Indemnified Parties"), if it prevails, from and against any damages, losses, costs, liabilities and expenses (including without limitation, attorney's fees and costs of enforcing this indemnity) incurred by the Indemnified Parties arising out of or resulting from a breach of this Agreement by you or your Representatives.

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York. You hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States District Courts located in the County of New York for any lawsuits, actions or other proceedings arising out of or relating to this Agreement and agree not to commence any such lawsuit, action or other proceeding except in such courts. You further agree that service of any process, summons, notice or document by mail to your address set forth above shall be effective service of process for any lawsuit, action or other proceeding brought against you in any such court. You hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, action or other proceeding arising out of or relating to this Agreement in the courts of the State of New York or the United States District Courts located in

the County of New York, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, action or other proceeding brought in any such court has been brought in an inconvenient forum. Any right to trial by jury with respect to any lawsuit, claim or other proceeding arising out of or relating to this Agreement is expressly and irrevocably waived.

This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof, supersedes all negotiations and agreements, oral or written, made prior to the execution hereof, and may not be amended or terminated except pursuant to a written agreement and duly executed by the parties hereto. No waiver of any provision of this Agreement shall be effective unless in writing and any such waiver shall affect only the matter specifically identified therein and shall not extend to any other matter. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect. This Agreement may be executed in counterparts, each such counterpart shall be deemed an original and all such counterparts shall together constitute one instrument. This Agreement shall expire 2 years from the date first written above or full execution of a definitive agreement on the proposed transaction, which shall supersede and replace this agreement.

[The rest of this page has been intentionally left blank.]

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

Performance Trust Capital Partners, LLC

By: _David F. Wilding_
Name: David F. Wilding
Title: General Counsel

Accepted and agreed as of
the date first written above:

Hunt Companies, Inc.

By: _Kara E. Harchuck_
Name: Kara E. Harchuck
Title: Executive Vice President, General Counsel

# EXHIBIT "C"

MANAGEMENT AGREEMENT

by and between

HUNT FINANCIAL SECURITIES, LLC, a Delaware limited liability company,

and

William H. Jennings II

Dated as of January 9, 2017

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (as may be amended, restated, or otherwise modified, this "Agreement"), is entered into as of January 9, 2017, by and between Hunt Financial Securities, LLC, a Delaware limited liability company ("Hunt"), and William H. Jennings II ("Manager").

### RECITALS

A.       Hunt wishes to engage Manager to build and manage a newly created broker-dealer platform of Hunt that focuses on securitizing, trading, and distributing all fixed income products, including those originated by Hunt or its Affiliates (the "Business"), pursuant to the terms and conditions of this Agreement.

B.       Simultaneously with the execution of this Agreement, Hunt and Manager are entering into the employment agreement attached hereto as Exhibit A-1 (the "Manager Employment Agreement").

C.       Manager wishes to be engaged as Manager of Hunt to build and manage the Business pursuant to the terms and conditions of this Agreement and the Manager Employment Agreement.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the parties agree as set forth in this Agreement.

### ARTICLE I
### DEFINITIONS

The following terms when used in this Agreement shall have the following meanings:

"Administrative Services" has the meaning given to that term in Section 3.4.

"Administrative Services Agreement" means the Administrative Services Agreement between Hunt and HCBS, dated as of March 26, 2014, as such agreement may be amended from time to time in accordance therewith.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person or is a director, officer, or manager of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by," and "under common control with") of a Person means the possession, direct or indirect, of the power to vote ten percent (10%) or more of the voting stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock, by contract, or otherwise.

"Aggregate Compensation" has the meaning given to that term in Section 3.3(b).

"Agreement" has the meaning given to that term in the preamble.

"Allocation Percentage" has the meaning given to that term in Section 5.2(a).

"Bad Act" means any action or omission by Manager that constitutes (or causes or results in) Cause.

"Budget" means, for any Fiscal Year, the budget of the Business, as such budget may be modified and updated in accordance with this Agreement.

"Business" has the meaning given to that term in the Recitals.

"Business Day" means a day on which federal banks are open for business in the State of New York.

"Business Plan" has the meaning given to that term in Section 3.1.

"Capital Reserves" means any reserves required to support the balance sheet of the Business as mutually determined and agreed by Manager and Hunt.

"Cause," with respect to Manager, has the meaning set forth in the Manager Employment Agreement or, with respect to any other Employee, has the meaning set forth in such Employee's Employment Agreement, as applicable.

"Closing Date Consideration" has the meaning given to that term in Section 7.3(a).

"Compensation Percentage" has the meaning given to that term in Section 3.3(b).

"Contingent Sale Proceeds" has the meaning given to that term in Section 7.3(b).

"Customer Acquisition" has the meaning given to that term in Section 4.3.

"Deposited Amounts" has the meaning given to that term in Section 7.3(b).

"Distributable Cash" means, at any time of determination, the amount of Revenues reflected on the financial statements of the Business and available for distribution hereunder, *less* (a) all liabilities of the Business set forth in Section 3.3, Section 3.4, and Section 3.5, *less* (b) any amounts reasonably determined by the Management Committee, together with Manager, to be required to fund (i) the anticipated working capital needs of the Business in accordance with the applicable Budget, (ii) any Capital Reserves (including, for the avoidance of doubt, any Held-Back Return), and (iii) any other reasonable reserves established in good faith by the Management Committee together with Manager (excluding any Capital Reserves).

"Employees" means the Executive Committee Members and any other Person employed by Hunt on behalf of the Business.

"Employment Agreement" means the Manager Employment Agreement and any Executive Employment Agreement.

2

"Executive Committee Member" has the meaning given to that term in Section 3.3(a).

"Executive Employment Agreement" has the meaning given to that term in Section 3.3(a).

"FINRA" means the Financial Industry Regulatory Authority.

"Fiscal Year" means the fiscal year of Hunt. As of the date of this Agreement, the Fiscal Year is the calendar year.

"Good Reason," with respect to Manager, has the meaning set forth in the Manager Employment Agreement or, with respect to any other Employee, has the meaning set forth in such Employee's Employment Agreement, as applicable.

"HCBS" means Hunt Companies Business Services, LLC, a Texas limited liability company.

"Held-Back Portion" has the meaning given to that term in Section 2.3(e)(i).

"Held-Back Return" means, for each of Manager and each Executive Committee Member with respect to each Fiscal Year, the interest accrued at the Interest Rate on the then-Held-Back Portion applicable to Manager or such Executive Committee Member, as applicable. The Held-Back Return shall be cumulative, and if and to the extent that the Held-Back Return is not repaid in full as of the last day of a Fiscal Year, the then-accrued but unpaid Held-Back Return shall be compounded annually at the Interest Rate.

"Hunt" has the meaning given to that term in the preamble.

"Hunt Return" means, with respect to each Fiscal Year, the interest accrued at the Line of Credit Interest Rate on the daily weighted average of the drawn and outstanding amounts under the Line of Credit during such Fiscal Year. The Hunt Return shall be cumulative, and if and to the extent that the Hunt Return is not repaid in full as of the last day of a Fiscal Year, the then-accrued but unpaid Hunt Return shall be compounded annually at the Line of Credit Interest Rate.

"Initial Non-Compensation Expense Amount" means $3,000,000.

"Initial Operating Expense Allocation" has the meaning given to that term in Section 4.1.

"Interest Rate" means LIBOR *plus* seven percent (7%); provided, that after the third (3rd) anniversary of the Launch Date, the Management Committee and Manager shall annually attempt in good faith to mutually agree to revise the Interest Rate to reflect then-current market rates; provided, further, that if no such agreement is reached, the Interest Rate will remain unchanged.

"Launch Date" has the meaning given to that term in Section 8.1.

"Line of Credit" has the meaning given to that term in Section 4.2.

3

"Line of Credit Increases" has the meaning given to that term in Section 4.2.

"Line of Credit Interest Rate" means (i) with respect to the drawn and outstanding amounts from the original $50,000,000 Line of Credit, eleven percent (11%), and (ii) with respect to the drawn and outstanding amounts from the Line of Credit Increases, the Interest Rate.

"Management Committee" has the meaning given to that term in Section 2.3.

"Management Distribution" has the meaning given to that term in Section 5.1(d).

"Manager" has the meaning given to that term in the preamble.

"Manager Employment Agreement" has the meaning given to that term in the Recitals.

"Non-Compensation Expense Cap" has the meaning given to that term in Section 3.5.

"Non-Compensation Expenses" means all expenses of the Business excluding the compensation expenses set forth in Section 3.3(b). Non-Compensation Expenses shall include, but shall not be limited to, rent of general office space, Bloomberg terminals and accounts, computers, phone turrets, Pershing account, non-Employee administrative, licensing, clearings, office supplies and furniture, computers and related equipment, travel, and entertainment expenses, third-party legal, accounting, recruiting fees, tax advisory, and other vendor fees and costs, as well as a reasonable allocation of the Business's pro-rata portion of any expenses paid to Hunt pursuant to and in accordance with the Administrative Services Agreement for facilities, IT (including cyber security) and systems (e.g. Yield Book), legal, regulatory compliance, accounting, tax, treasury, accounts payable, financial planning, human resources, payroll services, and marketing/ communications support.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, or other entity, or a government or any political subdivision or agency thereof.

"Potential Contingent Sale Proceeds" has the meaning given to that term in Section 7.3(c).

"Present Value Contingent Proceeds" has the meaning given to that term in Section 7.3(c).

"Qualification Date" means the first Business Day following (a) Manager's qualification and registration (i) as a Series 7 General Securities Registered Representative, (ii) as a Series 24 General Securities Principal, and (iii) in any other registration capacities required by FINRA and/or other applicable securities regulators, including any State regulatory authorities (collectively, "Securities Regulators"), as may be required for Manager to engage in and manage the Business in accordance with the terms of this Agreement, and (b) the satisfaction by Hunt and Manager of any other requirements or conditions that may be imposed by the Securities Regulators in connection with Manager's engagement in and management of the Business.

"Rabbi Trust" has the meaning given to that term in Section 7.3(b).

"Revenues" means the sum of items of income and gain of the Business earned from the activities of the Business including trading, investing, banking, and other service fees collected for the provision of any other services.  For purposes of determining Revenues, any Held-Back Portion shall be deemed consideration to Manager or the applicable Executive Committee Member paid in the Fiscal Year in which it was held back, and the amount of any Held-Back Return shall be deemed paid by the Business as an expense in the Fiscal Year in which it was accrued.

"ROFO Exercise Notice" has the meaning given to that term in Section 7.2.

"ROFO Purchasers" has the meaning given to that term in Section 7.2.

"ROFO Sale Price" has the meaning given to that term in Section 7.1.

"Section 409A" has the meaning given to that term in Section 9.13.

"Securities Regulators" has the meaning given to that term in the definition of "Qualification Date".

"Separation from Service" has the meaning given to that term in Section 9.13.

"Termination Date" has the meaning given to that term in Section 8.2(a).

"Third-Party Sale" has the meaning given to that term in Section 7.1.

"Third-Party Sale Notice" has the meaning given to that term in Section 7.1.

"Trustee" has the meaning given to that term in Section 7.3(b).

## ARTICLE II
## ENGAGEMENT AND ROLE OF MANAGER

2.1     Engagement of Manager.

(a)     Subject to the terms and conditions of the Manager Employment Agreement and Section 8.1, Manager is engaged as the President of the Business, and this Agreement shall govern the operation of the Business.

(b)     Manager shall use his best efforts to operate, and to cause the Employees to operate, the Business and manage the assets of the Business allocated or otherwise made available to it by Hunt in accordance with this Agreement, the Business Plan, and the Budget.

(c)     For the avoidance of doubt, Manager is not a member of Hunt and does not otherwise have a direct or indirect equity ownership in Hunt or any of its Affiliates, or any other beneficial interest in Hunt or any of its Affiliates or any of its or their respective assets.

(d)     Hunt will use its reasonable best efforts to cause its Affiliates to use the Business as the sole source to securitize and distribute all fixed income products originated by Hunt or any of its Affiliates that Hunt or any of its Affiliates determine to securitize. Further, the Business will also serve as the exclusive broker-dealer for Hunt and its Affiliates with respect to any other fixed income products not originated by Hunt or its Affiliates or which Hunt or any of its Affiliates determine to sell (or otherwise transfer) to any Person who is not Hunt or its Affiliate.

2.2     Authority of Manager.  Subject to the limitations set forth in this Section 2.2, Section 8.1 or elsewhere in this Agreement or the Manager Employment Agreement, Manager shall, in the good-faith exercise of his business judgment, conduct and direct the day-to-day affairs of the Business in accordance with the Budget and the Business Plan.  Manager shall keep the Management Committee generally appraised of material matters relating to the day-to-day conduct of the Business and shall provide such other information and general reporting to the Management Committee as the Management Committee may reasonably request from time to time.

2.3     Management Committee.

(a)     Manager shall report directly to a committee established by Hunt to oversee the management and business affairs of the Business, which shall be composed of (i) two (2) representatives appointed by the sole member of Hunt from time to time and (ii) for as long as Manager remains an employee of Hunt, Manager (the "Management Committee").  The Management Committee shall have direct supervisory authority over Manager and, except as otherwise specifically provided herein, ultimate management authority over the Business.

(b)     The Management Committee shall act by a majority vote of its members.

(c)     Except as expressly set forth in Section 2.3(d) and notwithstanding any contrary provision hereof, the prior approval of the Management Committee shall be required for the following actions (and Manager and the Business shall not take (or consent to) any of the following actions without the prior approval of the Management Committee):

(i)     approving any Budget or Business Plan (or any amendment thereof);

(ii)     performing any act in contravention of this Agreement or in violation of applicable law or regulation;

(iii)     conducting the operations of the Business in a manner materially inconsistent with the Business Plan or the Budget;

(iv)     taking any action on behalf of or in the name of Hunt or any of its Affiliates unrelated to the Business, including incurring, guaranteeing, or assuming any third-party indebtedness of Hunt or any of its Affiliates in connection with raising capital;

6

        (v)     taking any action that would or could reasonably be expected to cause Hunt or any of its Affiliates to issue an erroneous or misleading financial statement or report;

        (vi)    amending or terminating the Administrative Services Agreement;

        (vii)   except as expressly contemplated in the Budget or the Business Plan or as otherwise consistent with the day-to-day operation of the Business, selling, assigning, encumbering, or otherwise transferring any assets of the Business; or

        (viii)  paying any compensation to Manager or any other Employee, other than in accordance with this Agreement and the Employment Agreements.

        (d)     Compensation. The base salary of Manager and each Employee will be set forth in the applicable Employment Agreement or offer letter of each such Person (which base salary may be amended from time to time in accordance therewith). Each such Person may also be entitled to a bonus as set forth therein, which will be determined in the following manner (consistent with Section 3.3 and the terms of the applicable Employment Agreement):

        (i)     Manager will be entitled to a bonus pursuant to the terms of the Manager Employment Agreement;

        (ii)    each Executive Committee Member's bonus will be determined by Manager, subject to the prior approval of the Management Committee (which approval shall not be unreasonably withheld); and

        (iii)   the bonus of each other Employee (excluding any Executive Committee Member and Manager) will be determined by Manager in consultation with the Management Committee.

        (e)     Employee Holdback.

        (i)     Twenty-five percent (25%) of all bonuses payable to Manager and each Executive Committee Member who has an Allocation Percentage greater than zero (0) shall be withheld by the Business and treated as a Capital Reserve (any such held-back amounts, the "Held-Back Portion"), until such time as the aggregate Held-Back Portion for each such Person equals the product of five million dollars ($5,000,000) and such Person's Allocation Percentage. Notwithstanding the foregoing, if a Person's Allocation Percentage changes during a Fiscal Year, the Allocation Percentage that was in effect at the end of the prior Fiscal Year shall be used to determine such Person's Held-Back Portion for such Fiscal Year.

        (ii)    A Person's Held-Back Portion *plus* the Held-Back Return shall be paid to such Person as soon as reasonably practical after the date of the termination of such Person's employment with Hunt, but in no event later than thirty (30) days following such termination date.

(iii)    For the avoidance of doubt, any payments of the Held-Back Return pursuant to this Section 2.3(e) shall be deemed an expense of the Business incremental to Non-Compensation Expenses and the compensation expenses set forth in Section 3.3(b), which payments will reduce Distributable Cash.

### ARTICLE III
### BUSINESS AND OPERATIONS

3.1    Business Plan.  With respect to each Fiscal Year, Manager shall update and submit to the Management Committee for its approval a business plan for the upcoming Fiscal Year not less than sixty (60) days prior to the commencement of such Fiscal Year (the "Business Plan").

3.2    Budget.  With respect to each Fiscal Year, Manager shall prepare and submit to the Management Committee for its approval a Budget not less than sixty (60) days prior to the commencement of such Fiscal Year.   On a quarterly basis, Manager shall provide the Management Committee with quarterly financial reports for the Business, showing expenditures and a variance report showing any deviations from the Budget.  References herein to the Budget shall mean the Budget for the applicable Fiscal Year.

3.3    Employees; Employee Compensation Expenses.

(a)    Subject to the Budget and Business Plan and this Section 3.3, Manager will hire on behalf of Hunt (i) subject to the prior approval of the Management Committee (such approval not to be unreasonably withheld), senior executive Employees (each such employee an "Executive Committee Member"), and (ii) other Employees.  Manager shall also have the discretion to designate existing Employees as Executive Committee Members with the prior approval of the Management Committee (such approval not to be unreasonably withheld).  Unless otherwise determined by Manager, with the prior approval of the Management Committee, each Executive Committee Member will execute an employment agreement in substantially the form attached hereto as Exhibit A-2 (each, an "Executive Employment Agreement").

(b)    With respect to 2017 and each Fiscal Year thereafter and subject to Section 3.5, Manager and the Employees will collectively receive as compensation (inclusive of the Held-Back Portion for such Fiscal Year, which will be deemed received by each such Employee hereunder in the Fiscal Year in which it was accrued) ("Aggregate Compensation"), a percentage of the aggregate amount of the total Revenues for such Fiscal Year (the "Compensation Percentage") equal to:

(i)    for Fiscal Years 2017, 2018, and 2019, sixty-five percent (65%); provided, that Aggregate Compensation for Fiscal Year 2017 may exceed sixty-five percent (65%) of Revenues, but, if Aggregate Compensation for Fiscal Year 2017 exceeds sixty-five percent (65%) of Revenues, Aggregate Compensation for Fiscal Year 2017 shall in no event exceed the Initial Operating Expense Allocation;

(ii)    for Fiscal Years 2020 and 2021, sixty percent (60%); and

8

(iii)     for any subsequent Fiscal Year, an amount determined by Hunt after good faith consultation with Manager.

3.4     Administrative Services Agreement. Hunt has entered into the Administrative Services Agreement under which HCBS agrees to provide support services to Hunt (including to the Business), and Hunt shall pay the fee for such services in accordance with the terms of the Administrative Services Agreement (the "Administrative Services") which, as of the date of this Agreement, are no greater then ten percent (10%) of the cost of such services to HCBS. Certain of the Administrative Services will be provided to the Business and the costs of such Administrative Services will be reasonably allocated by Hunt to the Business, and the Business shall be obligated to reimburse Hunt (or its designated Affiliate(s)) for its pro-rata portion of such Administrative Services at the same rate Hunt and its Affiliates pay HCBS (taking into account the amount of Administrative Services actually utilized by the Business) in accordance with the Administrative Services Agreement and the Budget, which reimbursement shall be deemed a Non-Compensation Expense.

3.5     Non-Compensation Expenses. With respect to Fiscal Year 2017 and each subsequent Fiscal Year, the Budget shall reflect (and the Business will incur) a maximum amount of Non-Compensation Expenses equal to twenty percent (20%) of the total Revenues for each such Fiscal Year (the "Non-Compensation Expense Cap"); provided, that Non-Compensation Expenses for Fiscal Year 2017 may exceed twenty percent (20%) of Revenues, but, if Non-Compensation Expenses for Fiscal Year 2017 exceed twenty percent (20%) of Revenues, Non-Compensation Expenses for Fiscal Year 2017 shall in no event exceed the Initial Non-Compensation Expense Amount. In the event that Non-Compensation Expenses for any Fiscal Year exceed the Non-Compensation Expense Cap, the Compensation Percentage for such Fiscal Year will be reduced by an amount equal to such excess. For the avoidance of doubt, the Held-Back Return will not be a Non-Compensation Expense.

3.6     Principal Place of Business. For Fiscal Years 2017 and 2018, Hunt shall make available office space for the benefit of the Business in Hunt's offices located in Rye, New York, which will be charged to the Business (based on then-applicable market-rates) and deemed a Non-Compensation Expense, and at Manager's request, Hunt may determine in its discretion to provide office space in other locations. Thereafter, Manager may elect to rent other office space or stay in the same space, which will continue to be charged to the Business (based on then-applicable market-rates) and deemed a Non-Compensation Expense.

3.7     Marketing. The Business will be referred to as the Investment Banking Division of Hunt Financial Securities, LLC, and Manager's title will be President.

## ARTICLE IV
## AVAILABILITY OF FUNDS

4.1     Initial Operating Expense Allocation. Hunt shall make available to the Business an aggregate amount of up to $10,000,000 (the "Initial Operating Expense Allocation"), which

9

Initial Operating Expense Allocation shall be used by the Business to fund the initial compensation expenses of the Business and Non-Compensation Expenses, in the reasonable discretion of Manager and in accordance with the Budget and the Business Plan.

4.2     Line of Credit.  In addition to the Initial Operating Expense Allocation but, for the avoidance of doubt, only as of the Launch Date, Hunt shall make available to the Business a line of credit in an aggregate amount of up to fifty million dollars ($50,000,000) (the "Line of Credit") for purposes of supporting the balance sheet of the Business; provided, that for Fiscal Year 2017 only, a portion of the Line of Credit may be used for Non-Compensation Expenses in Fiscal Year 2017 up to the Initial Non-Compensation Expense Amount in accordance with Section 3.5.  On January 1, 2018, and each January 1 thereafter, the Line of Credit will be increased by an additional amount equal to fifty percent (50%) of Distributable Cash with respect to the prior Fiscal Year (any such increases, "Line of Credit Increases," which Line of Credit Increases shall be deemed part of the Line of Credit).  The Line of Credit may not be drawn on (a) prior to the Launch Date or (b) at any time that Manager or the Business is in material default under this Agreement or the Manager Employment Agreement (which default is not cured within seven (7) days following such breach).  It is understood that the amount drawn and outstanding under the Line of Credit shall be reduced for all purposes under this Agreement by any distributions under Section 5.1(c) on a first-in, first-out basis.

4.3     Additional Support.  Solely as may be required in order to induce a potential new customer of the Business to enter into any agreement with the Business (as determined by Manager in his reasonable discretion) (any such process, a "Customer Acquisition"), Hunt will use its commercially reasonable efforts to cooperate with and assist Manager in obtaining any related credit approval process in connection with such Customer Acquisition including by providing reasonable assurances to such potential customer that the Business is part of Hunt; provided, that neither Hunt nor any of its Affiliates shall be under any obligation to guarantee any obligations of the Business.

## ARTICLE V
## ALLOCATION AND PAYMENT OF DISTRIBUTABLE CASH

5.1     General Distributions.  Any distributions by the Business (including in connection with a Third-Party Sale) shall be distributed in accordance with this Section 5.1.  The Management Committee shall use its commercially reasonable efforts to cause the Business, no later than the fifteenth (15th) day of the third (3rd) calendar month following the end of the applicable Fiscal Year, to make distributions of Distributable Cash for such Fiscal Year in the following manner:

(a)     First, one hundred percent (100%) of all Distributable Cash to Hunt until the aggregate amount distributed to Hunt under this clause (a) is equal to the Hunt Return;

(b)     Second, one hundred percent (100%) of all Distributable Cash to Hunt until the aggregate amount distributed to Hunt under this clause (b) is equal to the Initial Operating Expenses Allocation;

(c) Third, one hundred percent (100%) of all Distributable Cash to Hunt until the aggregate amount distributed to Hunt under this clause (c) is equal to then-drawn-and-outstanding Line of Credit (including, for the avoidance of doubt, any Line of Credit Increases);

(d) Fourth, the remainder of all Distributable Cash, as follows: (i) thirty-five percent (35%) in the aggregate to Manager and the Executive Committee Members in accordance with their respective Allocation Percentages (any amount distributed pursuant to this Section 5.1(d)(i), a "Management Distribution") and (ii) sixty-five percent (65%) to Hunt (or any designated Affiliate).

5.2    Allocation of Management Distribution.

(a) All Management Distributions shall be distributed to Manager and the Executive Committee Members in accordance with their respective Allocation Percentages. No later than thirty (30) days following the Launch Date, Manager will determine, subject to the Management Committee's prior approval (such approval not to be unreasonably withheld or delayed), the percentage of Management Distributions Manager and each Executive Committee Member shall be entitled to receive (each, an "Allocation Percentage"); provided, that the Allocation Percentage of Manager may not exceed fifty percent (50%).

(b) Upon termination of employment with Hunt for any reason, the terminated Manager or Executive Committee Member, as applicable, will immediately forfeit such Person's right to any Allocation Percentage; provided, that if such termination is not on account of Cause and occurs after the end of a Fiscal Year and prior to the payment of any Management Distribution under Section 5.1(d)(i) with respect to such Fiscal Year, such Person shall receive his Allocation Percentage of such Management Distribution as if such Person were employed on the payment date of such Management Distribution and, provided, further, that if a Third-Party Sale occurs within six (6) months following termination of employment of Manager or any Executive Committee Member by Hunt without Cause or due to such Person's resignation with Good Reason, such Person shall receive his Allocation Percentage of the Distributable Cash from such Third-Party Sale as if such Person were employed on the date of such Third-Party Sale. Any Allocation Percentage forfeited in accordance with the preceding sentence shall be reallocated by Manager among Manager and the remainder of the Executive Committee Members (which need not be pro rata among Executive Committee Members) subject to Section 5.2(a) and to the prior approval of the Management Committee (such approval not to be unreasonably withheld or delayed).

(c) In connection with the hiring of any (or the promotion of any Employee to become an) Executive Committee Member in accordance with Section 3.3(a), Manager shall, subject to the Management Committee's prior approval (such approval not to be unreasonably withheld or delayed), designate such Person's Allocation Percentage, which shall reduce the Allocation Percentage of Manager and/or other Executive Committee Members as determined by Manager in his discretion; provided, that the aggregate Allocation Percentage shall equal one hundred percent (100%) at all times.

5.3    Withholding.   For the avoidance of doubt, all payments to Manager and any Employee under any Employment Agreement or this Agreement (including Management

11

Distributions and payment of the Held-Back Portion) shall be subject to applicable tax and other withholdings required by law as determined by Hunt. Any amounts so withheld or deducted shall be treated for all purposes of any applicable Employment Agreement and this Agreement as having been paid to Manager or such Employee, as applicable.

## ARTICLE VI
### REPRESENTATIONS AND WARRANTIES OF MANAGER AND HUNT

Each of the parties hereto represents and warrants to the other as follows:

(a)     The execution, delivery, and performance by such party of this Agreement are within such party's powers and do not contravene (i) any agreement to which such party is subject or (ii) any law or contractual restriction binding on or affecting such party.

(b)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority, regulatory body, or any third party is required for the due execution, delivery, and performance by such party of this Agreement.

## ARTICLE VII
### SALE OF BUSINESS

7.1     <u>Notice of Sale</u>.  If Hunt desires to sell all or at least a majority of the Business (whether in the form of an asset sale or otherwise) to a *bona fide* third party (a "Third-Party Sale"), Hunt shall provide Manager with notice of such intention (a "Third-Party Sale Notice"). Such Third-Party Sale Notice shall set forth the minimum price at which Hunt would consummate such Third-Party Sale (the "ROFO Sale Price"). Hunt's decision as to whether to effect a Third-Party Sale, the ROFO Sale Price, and all other terms of any such Third-Party Sale shall be made in the sole and absolute discretion of Hunt.

7.2     <u>Manager Right of First Offer</u>.  Upon receipt of a Third-Party Sale Notice, Manager (alone or in concert with one or more Executive Committee Members collectively, the "ROFO Purchasers") shall have the right (but not the obligation) to offer to purchase all (but not less than all) of the Business by delivering (a) notice to Hunt of such offer within sixty (60) days following the delivery of such Third-Party Sale Notice, specifying the terms and conditions of such offer, which shall provide for a maximum of one hundred twenty (120) days to achieve the closing, subject to customary closing conditions, including, any third-party or regulatory approvals (the "ROFO Exercise Notice"), and (b) a fully executed commitment letter, reflecting a reputable lender's commitment to provide to the ROFO Purchasers the aggregate amount necessary, together with the ROFO Purchasers' available cash on-hand, to purchase all (or the applicable portion) of the Business at the price set forth in the ROFO Exercise Notice. The ROFO Purchasers shall deliver to Hunt a cash earnest money deposit equal to at least five percent (5%) of the aggregate purchase price in connection with submitting any ROFO Exercise Notice. It is understood that the ROFO Exercise Notice may include a purchase price lower than ROFO Sale Price solely as a result of reducing the ROFO Sales Price by an amount equal to the proceeds Manager and the Executive Team Members would have received in accordance with <u>Section 7.3</u> if a Third-Party Sale were consummated with a third-party purchaser at the ROFO Sale Price. Following delivery of a ROFO Exercise Notice, the parties shall promptly commence

good-faith negotiations for a period of up to sixty (60) days, during which time each party shall use its commercially reasonable efforts to enter into written definitive agreements setting forth the definitive terms and conditions of the purchase. If (i) a ROFO Exercise Notice is not timely delivered, (ii) the parties fail to timely reach a definitive agreement, or (iii) after commercially reasonable efforts by the parties to achieve a closing, the proposed transaction fails to timely close, Hunt shall have the right to market and sell the Business to a third party at the ROFO Sale Price on commercially reasonable terms. If such marketing efforts fail to produce a *bona fide* third-party offer that meets or exceeds the ROFO Sale Price, Hunt shall not be permitted to market and sell the Business at a price less than ninety percent (90%) of the ROFO Sale Price without the consent of Manager and without delivery of a subsequent Third-Party Sale Notice.

      7.3    Third-Party Sale Proceeds.

      (a)    All proceeds payable to Hunt by a buyer of the Business in connection with a Third-Party Sale (net of transaction costs) and paid on the closing date of such Third-Party Sale ("Closing Date Consideration") shall be considered Distributable Cash hereunder and shall be allocated and distributed in accordance with Section 5.1. Any non-cash proceeds shall be valued in good faith by Hunt, subject to the consent of Manager (such consent not to be unreasonably withheld or delayed).

      (b)    One hundred percent (100%) of any contingent, escrowed, or otherwise held-back proceeds actually paid to Hunt by a buyer of the Business in connection with a Third-Party Sale (net of transaction costs not otherwise taken into account when determining Closing Date Consideration) on or prior to the third (3rd) anniversary of the closing date of a Third-Party Sale ("Contingent Sale Proceeds") shall be distributed to Hunt (or any designated Affiliate); provided, that Hunt shall, within five (5) Business Days following receipt of any Contingent Sale Proceeds, establish a grantor trust (the "Rabbi Trust") with a nationally recognized bank or trust company (the "Trustee"), and deposit into such Rabbi Trust an amount equal to the amount that Manager and the Executive Committee Members would have been entitled to receive had such Contingent Sale Proceeds been included in Closing Date Consideration (the "Deposited Amounts"). The terms of the Rabbi Trust shall be consistent with the model trust set forth in Revenue Procedure 92-64, such that neither Manager nor any Executive Committee Member is deemed to be in constructive receipt of income or incurring an economic benefit solely on account of the adoption of the Trust. In addition to any rights to receive a Management Distribution hereunder with respect to their allocable share of any Closing Date Consideration, Hunt shall cause the Trustee to release to Manager and the Executive Committee Members, on the third (3rd) anniversary of the closing date of a Third-Party Sale, the Deposited Amounts in accordance with their respective Allocation Percentages (as in effect immediately prior to the consummation of the Third-Party Sale). Hunt shall pay all fees and expenses related to the creation, funding, maintenance, and termination of the Rabbi Trust.

      (c)    If any contingent, escrowed, or otherwise held-back proceeds potentially payable to Hunt by a buyer of the Business in connection with the Third-Party Sale ("Potential Contingent Sale Proceeds") remain outstanding and unpaid as of the third (3rd) anniversary of the closing date of a Third-Party Sale, Hunt shall engage, at its sole expense, a reputable third-party valuation firm reasonably acceptable to Hunt and Manager to determine the probability-weighted present value of such Potential Contingent Sale Proceeds, whose determination shall be final and

binding on all parties (the "Present Value Contingent Proceeds"). Hunt shall pay to Manager and the Executive Committee Members, in accordance with their respective Allocation Percentages (as in effect immediately prior to the consummation of the Third-Party Sale), an amount in the aggregate equal to the amount that Manager and the Executive Committee Members would have been entitled to receive had such Present Value Contingent Proceeds been included in Closing Date Consideration. Any payment to Manager and the Executive Committee Members pursuant to this Section 7.3(c) shall in all events be made no later than the last day of the calendar year in which the third (3rd) anniversary of the closing date of a Third-Party Sale occurs, or if later, the fifteenth (15th) day of the third (3rd) calendar month following the third (3rd) anniversary of the closing date of a Third-Party Sale, provided that neither Manager nor any Executive Committee Member shall be permitted, directly or indirectly, to designate the taxable year of such payment.

(d)     For the avoidance of doubt, other than amounts payable pursuant to this Section 7.3, neither Manager nor any Executive Committee Member shall be entitled to receive any payments in connection with any Third-Party Sale.

## ARTICLE VIII
## TERM; TERMINATION

8.1     Effectiveness of Agreement.     Except as provided in this Section 8.1, this Agreement shall be effective immediately upon execution of this Agreement. Notwithstanding anything to the contrary herein, prior to the Launch Date, no portion of the Agreement shall be effective and no action of the Business shall be permitted to be undertaken, to the extent such portion and/or action is legally prohibited to be performed prior to the successful submission by Hunt and approval by FINRA of Hunt's Rule 1017 Application for Approval of Change of Ownership, Control or Business Operations with respect to Hunt's engaging in market-making activities, engaging in underwriting or selling group participant activities, acting as a dealer, and engaging in other securities transactions, as identified on Exhibit A-3 (the first Business Day following such approval by FINRA, the "Launch Date").     In addition, the roles and responsibilities of Manager set forth in this Agreement, including Section 2.2 and Section 3.3(a) (including the ability to execute documents on behalf of the Business, manage any Employees, meet with clients or potential clients of the Business, effectuate or negotiate trades or engage in any activities qualifying as supervisory over the Business) will not be effective prior to the Qualification Date; and from the date of this Agreement until the Qualification Date, for as long as he remains in his current position with Hunt, Marc Defife shall undertake such duties. In the event that the Launch Date does not occur on or prior to August 31, 2017, this Agreement shall automatically terminate.

8.2     Term of Agreement.

(a)     Subject to Section 8.1, this Agreement shall terminate on the first to occur of the following (the "Termination Date"): (i) the date of Manager's death or disability, (ii) the termination of the Manager Employment Agreement, (iii) the date on which a Third-Party Sale is consummated, and (iv) the date on which Hunt winds down the Business (with six (6) months' advance notice to Manager); provided, that any obligations of the Business with respect to amounts due and payable hereunder shall survive termination of this Agreement.

(b)     On and after any Termination Date, Manager and any Employees shall cease to have any right, obligation, or authority to act as manager of the Business or agent for or representative of the Business (including with respect to Management Distributions) other than with respect to any rights accrued but unpaid prior to the Termination Date, and Manager shall cease to serve on the Management Committee effective immediately upon the Termination Date.

8.3     Effect of Termination.  As soon as reasonably practicable following termination of this Agreement (except in connection with a Third-Party Sale), all assets of the Business shall be sold and all proceeds thereof *plus* any cash of the Business, *less* all accrued and unpaid liabilities of the Business, shall be distributed in accordance with Section 5.1 (with all such proceeds being deemed Distributable Cash).  Following any termination of this Agreement (except in connection with a Third-Party Sale) and effecting the provisions of the preceding sentence, Hunt shall have sole discretion over the Business.

## ARTICLE IX
## MISCELLANEOUS

9.1     Amendments.  This Agreement may be modified only by a written agreement executed by Hunt and Manager.  For the avoidance of doubt, any modification to this Agreement may be made by a written agreement between Hunt and Manager, and no Employee shall be deemed a third-party beneficiary of this Agreement or have any consent or veto rights with respect to any such modifications.

9.2     Confidentiality.  Neither Manager (nor any Employee or prospective Employee) nor Hunt shall, except as required by applicable law or with the consent of both Manager and Hunt, make any announcement about the creation of the Business or the commencement of the operations to be conducted thereby, disclose to any third party (other than legal, accounting, tax, financial, or other professional advisors who agree to a similar covenant of nondisclosure) the nature or existence of this Agreement or the business proposed to be conducted in accordance with the terms hereof.  Notwithstanding the foregoing, each of Manager and Hunt shall be permitted to make disclosures to then-current or -prospective customers, suppliers, or employees of Hunt to the extent necessary to further the interests of the parties hereunder or otherwise consistent with the Business Plan..

9.3     Indemnification.  Hunt shall indemnify, defend, and hold harmless Manager from and against any and all claims, damages, losses, and liabilities (including reasonable fees and expenses of counsel) incurred by or awarded against him arising from or relating to any action or omission taken by him in good faith within the scope of his authority under this Agreement; provided, that the indemnification shall not extend to claims, damages, losses, or liabilities that arise from or relate to one or more Bad Acts on the part of Manager.  Fees, expenses, and other costs that are subject to indemnification hereunder shall, at Manager's request, be advanced by Hunt to or on behalf of Manager prior to final resolution of a matter, so long as Manager shall have provided Hunt with a written undertaking to reimburse Hunt for all amounts so advanced if it is ultimately determined that Manager is not entitled to indemnification hereunder.

9.4     Notices.  All notices and other communications provided for hereunder shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient,

(b) sent to the recipient by reputable express courier service (charges prepaid), (c) mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, or (d) emailed to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 11:59 p.m. Central Time on a Business Day, and otherwise on the next Business Day.  Such notices and other communications shall be sent,

> if to Hunt, to its address at:

> > Hunt Financial Securities, LLC
> > c/o Hunt Companies, Inc.
> > 980 North Michigan Avenue, Suite 1150
> > Chicago, IL 60611-4522
> > Attention:  Chris Hunt, Chief Executive Officer
> > Email:  Chris.Hunt@huntcompanies.com
> > Attention:  Kara Harchuck, General Counsel
> > Email:  Kara.Harchuck@huntcompanies.com

> and if to Manager, at his address at:

> > William H. Jennings II
> > 6 Homewood Lane
> > Darien, CT 06820
> > Email: WHJII@ICloud.com

> with a copy to (which shall not constitute notice)

> > David Schwartz
> > Skadden, Arps, Slate, Meagher & Flom LLP
> > Four Times Square
> > New York, NY 10036
> > Email:  David.Schwartz@Skadden.com

or to such other address or facsimile number or to the attention of such other Person as the recipient party has specified by prior notice to the sending party.

    9.5    <u>Waiver of Jury Trial</u>.  Each party hereby irrevocably waives all right to trial by jury in any action, proceeding, or counterclaim (whether based on contract, tort, or otherwise) among them or their Affiliates arising out of or relating to this Agreement.

    9.6    <u>No Third-Party Beneficiaries</u>.  This Agreement is entered into solely for the benefit of the parties, and no Person shall be a third-party beneficiary hereof or otherwise entitled to enforce this Agreement.

    9.7    <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any

applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

9.8    Headings. The various headings of this Agreement executed pursuant hereto are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.

9.9    Governing Law. The laws of the State of New York shall govern all questions concerning the construction, validity, interpretation, and enforceability of this Agreement and the exhibits and schedules attached hereto, and the performance of the obligations imposed by this Agreement, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

9.10    Consent to Jurisdiction.

(a)    Each party hereby irrevocably and unconditionally submits, for himself or itself and his or its property, to the exclusive jurisdiction of the U.S. Federal District Court for the Southern District of New York, or if such court does not have subject matter jurisdiction over any matter, the New York State Supreme Court sitting in New York County, New York, and any appellate court thereof, over any action or proceeding arising out of or related to this Agreement or for recognition or enforcement of any judgment, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each party hereby agrees that service of summons, complaint, or other process in connection with any such proceeding may be made in the same manner set forth in Section 9.4 for providing notices, and that service so made shall be as effective as if personally made in the State of New York.

(b)    Each party irrevocably and unconditionally waives, to the fullest extent that he or it may legally and effectively do so, any objection that he or it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement in any New York State or federal court of the United States of America sitting in New York County, New York. Each party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

9.11    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, except that Manager may not transfer any of his rights or obligation, hereunder.

9.12    Entire Agreement. This Agreement constitutes the entire agreement among the parties concerning the subject matter of this Agreement and terminates, supersedes, and preempts any prior discussions, negotiations, understandings, agreements, term sheets, or representations by or among the parties, written or oral, with respect to the subject matter of this Agreement.

17

9.13   Section 409A.   It is Hunt's intent that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code ("Section 409A"), to the extent subject thereto, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted and administered to be in compliance therewith.   Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, an Employee shall not be considered to have terminated employment with Hunt or any subsidiary or affiliate thereof for purposes of this Agreement unless the Employee would be considered to have incurred a "separation from service" from Hunt or any of its subsidiaries or affiliates within the meaning of Section 409A ("Separation from Service").   Each amount to be paid or benefit to be provided under this Agreement shall be construed as a separate identified payment for purposes of Section 409A, and any payments described in this Agreement that are due within the "short-term deferral period" as defined in Section 409A or any other exemption under Section 409A shall not be treated as deferred compensation unless applicable law requires otherwise.   To the extent that any reimbursements or in-kind benefits due to an Employee under this Agreement constitute "deferred compensation" under Section 409A, any such reimbursements and in-kind benefits shall be paid to the Employee in a manner consistent with Treas. Reg. Section 1.409A-3(i)(1)(iv).   Without limiting the foregoing and notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to this Agreement during the six (6) month period immediately following the Employee's Separation from Service shall instead be paid on the first business day after the date that is six (6) months following the Employee's Separation from Service (or death, if earlier).   This Agreement may be amended in any respect deemed by Hunt (with the consent of Manager) in good faith to be necessary in order to preserve compliance with Section 409A without imposing any additional interest, taxes, or penalties on the Employee.   Until received by Employees, any amount payable under this Agreement shall constitute an unfunded, unsecured promise to pay amounts in the future, and the parties will not take any position inconsistent with this treatment (including withholding any tax with respect to such amounts pursuant to Section 5.3 until, and except to the extent that, such amounts are actually paid in cash or property).

9.14   Counterparts.   This Agreement may be executed simultaneously in two or more separate counterparts, any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

9.15   Construction and Interpretation.   When a reference is made in this Agreement to Sections or Exhibits, such reference shall be to a Section of or Exhibit to this Agreement unless otherwise indicated.   The table of contents, headings and footers contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.   Whenever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation." Words in the singular form will be construed to include the plural, and vice versa, unless the context requires otherwise. Unless the defined term "Business Days" is used, references to "days" in this Agreement refer to calendar days.   The parties have participated jointly in the negotiation and drafting of this Agreement.   If any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all parties, and no presumption or burden of proof shall arise

favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. The use in this Agreement of the masculine pronoun in reference to a natural person shall be deemed to include the feminine pronoun, as the context may require.  Any obligation of any person under this Agreement to "cause" any other Person to take or refrain from taking any action shall be limited to the extent such obligated Person has the ability to do so pursuant to applicable law or contract.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THIS MANAGEMENT AGREEMENT is executed as of the date first set forth above.

**HUNT:**

HUNT FINANCIAL SECURITIES, LLC, a
Delaware limited liability company

By: Marc DeFife

Name:

Title: President

**MANAGER:**

William H. Jennings II

THIS MANAGEMENT AGREEMENT is executed as of the date first set forth above.

HUNT:

HUNT FINANCIAL SECURITIES, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

MANAGER:

William H. Jennings