# EXHIBIT "D"

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is made as of January 9, 2017, by and between Hunt Financial Services, LLC (the "Company"), and William H. Jennings II ("Executive," and together with the Company, the "Parties"). Capitalized terms used, but not defined, herein shall have the meanings given to them in the Management Agreement (as defined below).

## RECITALS

A.   Simultaneously with the execution of this Agreement, the Parties are entering into that certain Management Agreement (the "Management Agreement"), pursuant to which Executive shall build and manage a newly created broker-dealer platform of the Company that focuses on securitizing, trading, and distributing structured and other fixed-income products, including those derived from certain collateralized debt products relating to the housing market and originated by the Company or its Affiliates.

B.   In connection with the execution of the Management Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions of Executive's employment with the Company.

C.   The Company desires to retain Executive, and Executive desires to be so employed by the Company, subject to the terms, conditions, and covenants set forth herein and in the Management Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## EMPLOYMENT SERVICES

1.1   Employment Term.  The period of Executive's employment under this Agreement shall begin on January 9, 2017, and shall continue until terminated by either Party in accordance with Article III (such period of employment, the "Employment Term"); provided, that this Agreement, and Executive's employment with Hunt, will automatically terminate (without application of Sections 3.3 and 4.1 hereof) if the Launch Date does not occur on or prior to August 31, 2017.

1.2   Title and Position.  During the Employment Term, Executive shall hold the position of President of the Business and shall report to the Management Committee. Executive's duties, responsibilities, and authority will be those outlined in the Management Agreement. Notwithstanding the foregoing, the roles and responsibilities of Executive set forth in Section 2.2 of the Management Agreement (including the ability to execute documents on behalf of the Business, manage any Employees, meet with clients or potential clients of the



Business, effectuate or negotiate trades, or engage in any activities qualifying as supervisory over the Business) will not be effective prior to the Qualification Date.

    1.3    Representations. Executive represents and warrants that he is free to accept employment with the Company and that he has no existing commitments or obligations of any kind (including any restrictive covenant(s) for the benefit of any prior employer) that would hinder or interfere with his obligations hereunder.

    1.4    Performance of Duties. In performing his duties hereunder, Executive shall conduct himself in a professional manner and adhere to all applicable laws, rules, regulations, and reasonable written Company rules, policies, and procedures that may be in effect from time to time provided to Executive in writing; provided that in the event of any conflict between any such rules, policies, and procedures and the terms of this Agreement or the Management Agreement, the terms of this Agreement or the Management Agreement, as applicable, shall control. Executive shall devote his full business time, attention, skill, and energy to the business and affairs of the Business and shall use his reasonable best efforts to faithfully perform his responsibilities in a diligent, trustworthy, efficient, and businesslike manner so as to advance the best interests of the Business. Executive is not prohibited from investing as a passive investor in other non-competitive businesses or from participating in civic, charitable, educational, and professional activities, in each case so long as such activities do not materially detract from or conflict with the performance of his duties under this Agreement or the Management Agreement or otherwise violate any express provision of this Agreement or the Management Agreement.

## ARTICLE II
## COMPENSATION

    2.1    Base Salary. The Company shall pay Executive an annual base salary in the initial annual amount of $500,000.00 (the "Base Salary"), payable in accordance with the general payroll practices of the Company. The Base Salary shall be reviewed, not less often than annually, and may be increased in the discretion of the Management Committee.

    2.2    Health Care and Benefit Plans. Executive will be eligible to participate in the Company's "Benefit Program" to include Healthcare, Dental, Prescription, Flexible Spending Accounts, Life Insurance, Short Term Disability, Long Term Disability, 401(k) Plan, Vacation/Paid Time Off and others. All benefits are governed by the respective plan documents, and the Company reserves the right to modify, add, or eliminate them in its sole discretion.

    2.3    Annual Bonus Eligibility. Executive will be eligible to receive an annual bonus for each year during the Employment Term, equal to an amount of up to $1,500,000, which bonus shall be determined by Executive in his sole discretion (each such bonus a "Primary Bonus"). In addition, Executive will be eligible to receive such additional bonuses, if any, as determined by the Management Committee in its sole discretion (each such bonus, an "Additional Bonus," and together with the Primary Bonus, a "Bonus"). Except for the Held-Back Portion, any year's annual Bonus, to the extent earned, shall be paid in the following the calendar year but no later than February 1 of such following calendar year, subject to Executive's continued employment in good standing through (a) the date of payment, with respect to any Additional Bonus, or (b) the last day of the calendar year, with respect to any Primary Bonus.

All bonuses payable to Executive shall be subject to the terms and conditions of the Management Agreement, and, for the avoidance of doubt, no Bonus shall be paid in respect of a given Fiscal Year in which there are not sufficient Revenues (or with respect to Fiscal Year 2017, Initial Operating Expense Allocation) to accommodate the payment of such Bonus (together with all other Aggregate Compensation for such Fiscal Year) within the Compensation Percentage for such Fiscal Year.

2.4     Participation in Management Distributions.  Executive shall be eligible to be paid his allocable portion of any Management Distribution in accordance with the terms of the Management Agreement.

2.5     Reimbursement of Business Expenses.  The Company shall reimburse Executive for all reasonable and ordinary business expenses incurred by Executive in the performance of his duties under this Agreement in accordance with the Company travel and entertainment expense reimbursement policy then in effect, provided that Executive submits a request for reimbursement along with a copy of the receipt, expense statement, or other documentation of the expense that the Company may reasonably require in accordance with the Company expense policy then in effect.

## ARTICLE III
## TERMINATION OF EMPLOYMENT

3.1     Termination Date.  Either Party may terminate the Employment Term and Executive's employment hereunder for any reason or no reason, subject to the terms below (the effective date of separation being the "Termination Date").  Notwithstanding the foregoing, prior to the seventh anniversary of the Launch Date, the Company may not terminate Executive's employment without Cause, and Executive may not resign (other than in the case of death or Disability) without Good Reason.  Executive agrees to provide the Company with at least one hundred eighty (180) days' advance written notice of his intent to terminate his employment without Good Reason; provided, that the Company may waive all or a portion of any such notice and thereby accelerate the Termination Date in its sole discretion, without re-characterizing the termination as a voluntary resignation without Good Reason.  Notwithstanding the foregoing, the Employment Term and Executive's employment hereunder shall terminate automatically upon the earlier to occur of (i) the termination of the Management Agreement for any reason and (ii) Executive's death or Disability, and in no event shall any such automatic termination be deemed a termination by the Company without Cause or by Executive with Good Reason.

3.2     Accrued Obligations.  Upon termination by either Party for any reason, Executive, or Executive's estate (in the case of Executive's death), shall be entitled to receive Executive's Base Salary, accrued and unpaid Bonuses (subject to Section 2.3 above), benefits, and unused vacation, in each case as accrued through the Termination Date, reimbursement of all expenses properly accrued prior to the Termination Date and timely submitted for reimbursement, and any Held-Back Portion and Held-Back Return, if any, in accordance with Section 2.3 of the Management Agreement (collectively, the "Accrued Obligations").

3.3     Severance Benefits.  If the Company terminates Executive's employment for any reason other than Cause or Executive resigns for Good Reason, Executive shall be entitled to

3

receive, in addition to the Accrued Obligations (the "Severance Benefits"), a cash severance benefit consisting of (a)(i) without duplication to the first proviso in Section 5.2(b) of the Management Agreement, any then-unpaid Allocation Percentage of Executive of the prior Fiscal Year's Management Distribution and (ii) the Primary Bonus for the year of termination, prorated (based on number of days that elapsed through the Termination Date from the beginning of the year) for the portion of the year worked; provided, that no prorated Primary Bonus shall be paid in respect of a given Fiscal Year of termination in which there are not projected to be sufficient Revenues to accommodate the payment of such prorated Primary Bonus (together with all other Aggregate Compensation for such Fiscal Year) within the Compensation Percentage for such Fiscal Year, as determined by the Management Committee in good faith based on the then-prior-year Revenues and then-current-year pro forma Revenues as of the date of termination, and (b) an amount equal to three (3) times either (i) if such termination occurs prior to July 1st of a given Fiscal Year, Executive's Allocable Percentage of the Management Distribution paid or payable to him in respect of the last-completed Fiscal Year or (ii) if such termination occurs after June 30th of a given Fiscal Year, Executive's Allocable Percentage of the Management Distribution payable to him in respect of the then-current Fiscal Year, in each case pursuant to Sections 5.1(d)(i) and 5.2 of the Management Agreement. The component of the Severance Benefits set forth in clause (a)(i) of the immediately preceding sentence shall be paid at such time that the amount would have been paid to Executive pursuant to the Management Agreement but for such termination of employment, the component of the Severance Benefits set forth in clause (a)(ii) of the immediately preceding sentence shall be paid on the sixtieth (60th) day following Termination Date, and the component of the Severance Benefits set forth in clause (b) of the immediately preceding sentence shall be paid in three (3) equal annual installments on each of the first (1st) three (3) anniversaries of the date of termination. Executive shall not be entitled to any of the Severance Benefits unless Executive timely executes and returns to the Company a separation agreement (the "Separation Agreement") substantially in the form of Exhibit 1 attached hereto, and the period of time for revoking the Separation Agreement has expired, not later than sixty (60) days after the Termination Date. Any Severance Benefits that would otherwise have been paid prior to such date shall be paid in a lump sum as soon as practical after such date, without interest; provided that if the sixtieth (60th) day after the Termination Date occurs in the calendar year following the year that includes the Termination Date, any Severance Benefits that constitute nonqualified deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended, shall not be paid until the first business day of the year that follows the year that includes the Termination Date even if the revocation period expires earlier. Any obligation of the Company to pay the Severance Benefits shall cease upon Executive's material breach of Executive's obligations under (i) Article IV of this Agreement, (ii) the Management Agreement, or (iii) the Separation Agreement. Upon a termination by the Company without Cause or by Executive with Good Reason, Executive's sole and exclusive remedy shall be the receipt of the Severance Benefits hereunder.

    3.4   Definitions.

        (a)    As used herein, "Cause" means the occurrence of any of the following with respect to Executive: (a) Executive's engaging in (i) a criminal act constituting a felony, (ii) any other material violation of law or regulation that is related to the Business or that could reasonably be expected to adversely impact Hunt, any of its Affiliates, or the Business in any material respect, or (iii) any fraud, deceit, other willful misconduct, or similar acts of moral

turpitude that is related to the Business or that could reasonably be expected to adversely impact Hunt, any of its Affiliates, or the Business in any material respect; (b) Executive's misappropriation, conversion, or misuse of funds or other assets of the Company; (c) Executive's material breach of his obligations under this Agreement or the Management Agreement; (d) Executive's failure to obtain within a reasonable time following the date hereof or thereafter ceasing to qualify and be registered (x) as a Series 7 General Securities Registered Representative, (y) as a Series 24 General Securities Principal, or (z) in any other registration capacities required by FINRA or any other Securities Regulator as may be required for Executive to engage in and manage the Business in accordance with the terms of this Agreement and the Management Agreement; (e) an entry of an order, duly issued by any U.S. state or federal regulatory authority having jurisdiction over the Company, that has the effect of enjoining, suspending, or barring Executive, for thirty (30) days or more, from being associated with the Business; (f) either (x) a finding by any regulatory or self-regulatory organization that Executive has violated any U.S. federal or state securities law or (y) Executive's entering into a consent decree or settlement with such regulatory or self-regulatory organization in connection with any violation by Executive of any U.S. federal or state securities law (whether or not admitting, or neither admitting nor denying, in either case, such violation); (g) Executive's material breach of any written policies or procedures of the Company applicable to Executive and previously provided to Executive, including without limitation any compliance manual or code of ethics to which Executive is subject in the course of his duties for the Business; or (h) Executive's sustained failure to perform his duties as an employee for any reason other than illness, Disability, or death.  In order to terminate Executive for Cause pursuant to clause (c), (d), (g), or (h), the Company shall provide Executive with no less than thirty (30) days' written notice of the Company's intention to terminate him with Cause, such notice to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination with Cause is based, and such termination shall be effective at the expiration of such thirty (30) day notice period unless Executive has cured such act or acts or failure or failures to act that give rise to Cause during such period; provided, that the foregoing notice and cure opportunity shall not apply with respect to any act(s) or failure(s) to act of a similar type as to which Executive was provided a notice of Cause and right to cure within the immediately preceding twelve (12) month period.

(b)     As used herein, "Disability" means a determination by the Management Committee that Executive is unable, as a result of medically determinable physical or mental illness, injury, or condition, with or without accommodation, to perform his duties under this Agreement for a period equal to the eligibility period for long-term disability benefits under the Company's plan or policy then in effect (or, if no such plan or policy is in effect, one hundred eighty (180) days).

(c)     As used herein, "Good Reason" means Executive's termination of his employment only after the occurrence of one of the following events without Executive's consent: (i) a material reduction in Executive's then-current Base Salary; (ii) a permanent relocation of Executive's work location of more than fifty (50) miles from New York City; (iii) the Company's material breach or material violation of the Agreement or the Management Agreement; or (iv) a material adverse change in Executive's duties, responsibilities, title or line of reporting.  Each of the foregoing events will cease to constitute Good Reason if (x) Executive fails to give the Company written notice of Executive's intention to resign his position with the

Company within thirty (30) days after Executive has knowledge of, or should reasonably have had knowledge of, the occurrence of such event, such notice specifically referring to such event, or (y) the Company cures the condition that constitutes Good Reason within thirty (30) days following the receipt of such notice. To qualify as a resignation or termination for Good Reason, Executive must terminate his employment within thirty (30) days following the expiration of such cure period.

3.5    Return of Company Property. No later than five (5) Business Days following the Termination Date or at any earlier time upon the Company's request, Executive shall return to the Company, and shall not retain in any form or media of expression, all property of the Company or any Affiliate that is then in Executive's possession, custody, or control, including, without limitation, all keys, access cards, credit cards, computer hardware and software, documents, records, policies, marketing information, design information, specifications and plans, database information and lists, and any other property or information that Executive has relating to the Company or any of its Affiliates or any of their respective customers or employees (whether those materials are in paper or computer-stored form), and including but not limited to any documents containing, summarizing, or describing any Confidential Information. Upon the Company's request, Executive will sign a sworn certification, in a form acceptable to the Company, verifying that Executive has returned all property of the Company and its Affiliates, including any Confidential Information and copies thereof.

## ARTICLE IV
## EXECUTIVE COVENANTS

4.1    Non-Solicitation, Non-Interference, and Non-Competition.

(a)    Non-Solicitation of Employees. During the Employment Term and the three (3) year immediately following the Termination Date for any reason (the "Restricted Period"), Executive shall not directly or indirectly, on Executive's own behalf or for any other Person or entity, employ or hire, solicit for employment or hire, or attempt to solicit for employment or hire, any person who is or was employed by the Business at any time within six (6) months prior to the date of such solicitation or hire, or attempted solicitation or hire.

(b)    Non-Interference with Business Relationships. During the Restricted Period, Executive shall not directly or indirectly, on Executive's own behalf or for any other Person: (i) knowingly interfere with any contractual relationship between any Restricted Business Contact and the Business, (ii) solicit a Restricted Business Contact for purposes of engaging in any aspect of the Business with such Restricted Business Contact, or (iii) divert (or attempt to divert) any business or business opportunities away from the Company or any Affiliate. A "Restricted Business Contact" is any of the following: (x) any of the Company's (or its Affiliate's) actual or prospective joint venture partners, financing sources, or investors, or (y) any material vendor, subcontractor, supplier, or other service provider under contract with the Company (or its Affiliate), in each instance at any time during the two (2) years preceding the Termination Date.

(c)    Non-competition. During the Restricted Period, Executive shall not be engaged, or prepare to be engaged, directly or indirectly, either as an employee, consultant,

6

contractor, investor, officer, or board member, or in any other capacity, in any business or occupation, whether or not on a paid basis, that engages in the Business; provided that nothing contained herein shall preclude Executive from owning not more than one percent (1%) of the publicly traded stock of any company engaged in such Business.

4.2     Non-Disparagement.    At all times, both during and after the termination of employment for any reason, Executive will not, directly or indirectly, make (either orally or in writing) any disparaging, derogatory, or defamatory remarks concerning the Company or any of its Affiliates or any of their respective directors, officers, employees, members, or shareholders, or their respective business practices, to any third party (including, but not limited to, members of the media, the press, any internet posting, any blog posting, or any other form of communication). The foregoing shall not prohibit Executive from making any such statement or announcement (i) in confidence to his legal or other professional advisors or employees, (ii) when the making of any such statement or announcement is required by law, legal process, or by any court, arbitrator, mediator, or administrative or legislative body, (iii) with respect to any litigation, arbitration, or mediation, or (iv) in connection with reporting possible violations of federal law or regulation to any governmental agency or entity.

4.3     Nondisclosure of Confidential Information.

(a)     As used herein, the term "Confidential Information" shall mean all non-public information belonging to or licensed to the Company or any Affiliate, in whatever form or medium, including but not limited to (i) the names, addresses, telephone numbers, contact persons, and other identifying and confidential information about actual or prospective customers or clients, accounts, vendors, independent contractors, licensors, or suppliers of goods or services of or to the Company or any Affiliate; (ii) the terms of any agreements or contracts between the Company or any Affiliate and any customer, account, supplier, vendor, or independent contractor, and any information related to any proposals, bids, sales, or other prospective business opportunities of the Company or any Affiliate; (iii) litigation, claims, regulatory and other investigations, legal strategies, resolutions, settlements, and other information relating to legal or administrative proceedings, claims, demands, audits, investigations, or similar proceeding involving the Company or any Affiliate and any of its past or present officers, managers, agents, members, directors, or employees, or other personnel; (iv) contracts, legal and insurance documentation, legally protected personal information, present or future business plans and strategies, customer data, customer lists, business and pricing practices and procedures, security solutions, commercial or financial information, any information related to Company or any Affiliate products or services not generally ascertainable from public or published information; (v) online research and marketing data and other analytic data based upon or derived from such online research and marketing data; (vi) any and all information disclosed to Executive or known, learned, created, or observed as a consequence of Executive's employment with the Company regarding or relating in any respect to the Company's business methods and techniques (including all customer lists, records of customer usage and requirements, and similar information relating to customers or to prospective customers), marketing or sales plans or proposals, employee information, cost information, financial information, pricing materials, non-public price lists, machines, research and development, hardware, manufacture, purchasing, accounting, engineering, or business communications; and (vii) any Work (as defined below) that is not generally available or known publicly or other information or documentation that

7

Executive has a reasonable basis to believe to be proprietary or confidential information or that is treated as proprietary or confidential information by the Company or any Affiliate, including all third-party inventions, works, trade secrets, business techniques, marketing strategies and other proprietary or confidential information that Executive receives or has access to as a result of employment with the Company and as to which the Company or any Affiliate has any duty of confidentiality. Notwithstanding the foregoing, Confidential Information shall not include: (i) knowledge, data, or information that is generally known or becomes available publicly (other than as a result of any breach of an agreement); or (ii) knowledge, data, or information gained without a breach of this Agreement or the Management Agreement on a non-confidential basis from a person who is not legally prohibited from transmitting the information to Executive. Executive recognizes and acknowledges that the Confidential Information is a valuable, special and unique asset of the Company's and its Affiliates' business.

(b)     Executive acknowledges that Executive will be entrusted with Confidential Information.

(c)     At all times, both during and after the termination of employment for any reason, Executive (1) shall hold the Confidential Information in strict confidence, take all reasonable precautions to prevent the inadvertent disclosure of the Confidential Information to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (2) shall not use, copy, divulge, or otherwise disseminate or disclose any Confidential Information, or any portion thereof, to any unauthorized person; (3) shall not make, or permit or cause to be made, copies of the Confidential Information, except as necessary to carry out Executive's authorized duties as an employee of the Company; and (4) shall promptly and fully advise the Company of all facts known to Executive concerning any actual or threatened unauthorized disclosure of which Executive becomes aware.

(d)     Executive hereby recognizes that the Company shall be the sole owner of all copyrights and trade secret rights, throughout the world (collectively, "Proprietary Rights") in connection with such Confidential Information.

(e)     If Executive receives any subpoena or becomes subject to any legal obligation that might require Executive to disclose Confidential Information, Executive will provide prompt written notice of that fact to the Company, enclosing a copy of the subpoena and any other documents describing the legal obligation. In the event that the Company objects to the disclosure of Confidential Information, by way of a motion to quash or otherwise, Executive agrees to not disclose any Confidential Information while any such objection is pending.

(f)     Executive understands that the Company and its Affiliates have and will receive from third parties confidential or proprietary information ("Third-Party Information") under a duty to maintain the confidentiality of such Third-Party Information and to use it only for limited purposes. During the term of Executive's association with the Company and at all times after the termination of such association for any reason, Executive will hold Third-Party Information in confidence and will not disclose or use any Third-Party Information unless expressly authorized by the Company in advance or as may be necessary to perform Executive's obligations with the Company, subject to any agreements binding on the Company with respect to such Third-Party Information.

8

(g)     Executive will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or of any other person to whom Executive has an obligation of confidentiality, and Executive will not bring onto the Company's premises any unpublished documents or any property belonging to any former employer or of any other person to whom Executive has an obligation of confidentiality.

4.4     <u>Work Made for Hire</u>.

(a)     Executive agrees that "<u>Work</u>" (defined to mean all concepts, data, databases, inventions, discoveries, improvements, sales techniques and strategies, trade secrets, original works of authorship, know-how, algorithms, computer programs, proposals, strategies, processes, methodologies and techniques, and any and all other information, materials, and intellectual property, in any medium) that Executive, alone or jointly, creates, conceives, develops, or reduces to practice or causes another to create, conceive, develop, or reduce to practice, within the scope of Executive's employment by the Company, shall be a "work made for hire" within the meaning of that term under United States Copyright Act, 17 U.S.C. §§ 101 et seq.  As a condition of Executive's employment with the Company, Executive hereby assigns and transfers to the Company, effective as of the date of its creation, any and all rights, title, and interest that Executive may have or may acquire in any Work, effective as of the date of its creation, including any and all intellectual property rights in the Work, and the right to prosecute and recover damages for all infringements or other violations of the Work.  As a condition of employment with the Company, Executive gives the Company the unrestricted right to use, display, distribute, modify, combine with other information or materials, create derivative works based on, sell, or otherwise exploit for any purpose, the Work and any portion thereof, in any manner and media throughout the world.  Executive irrevocably waives and assigns to the Company any and all so-called moral rights that Executive may have in or with respect to any Work.  Upon the Company's request, Executive shall promptly execute and deliver to the Company any and all further assignments, patent applications, or such other documents, as the Company may deem necessary to effectuate the purposes of this Section.  Executive hereby appoints the Company with full power to execute any and all such documents that Executive fails to execute within five (5) business days after the Company's request therefor.

(b)     Notwithstanding the foregoing, Work does not include any invention that Executive develops (i) entirely on Executive's own time as may be permitted by this Agreement and without the use of any equipment, supplies, facilities, or information of the Company or (ii) not relating to the Business, unless such invention relates to the Company's actual or demonstrably anticipated research or development or results from any work Executive performs for the Company or any of its Affiliates.

4.5     <u>Equitable Modification</u>.  If any court of competent jurisdiction shall deem any provision in this ARTICLE IV too restrictive, the other provisions shall stand, and the court shall modify the unduly restrictive provision to the point of greatest restriction permissible by law.

4.6     <u>Remedies</u>.  The Company and Executive agree that damages will accrue to the Company by reason of Executive's failure to observe any of the covenants in this ARTICLE IV. Therefore, if the Company shall institute any action or proceeding to enforce such provisions, Executive waives the claim or defense that there is an adequate remedy at law and agrees in any

such action or proceeding not to (i) interpose the claim or defense that such remedy exists at law or (ii) require the Company to show that monetary damages cannot be measured or to post any bond. Without limiting any other remedies that may be available to the Company, Executive hereby specifically affirms the appropriateness of injunctive or other equitable relief in any such action. Executive also acknowledges that the remedies afforded the Company pursuant to this ARTICLE IV are not exclusive, nor shall they preclude the Company from seeking or receiving any other relief, including without limitation, any form of monetary or other equitable relief. Upon the reasonable request by the Company, Executive shall provide reasonable assurances and evidence of compliance with the covenants set forth in this ARTICLE IV.

4.7    Whistleblower Protection; Defense of Trade Secrets.    Notwithstanding the foregoing, nothing in this Agreement shall prohibit Executive from reporting possible violations of federal law or regulation to any governmental agency or entity, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Executive does not need the prior authorization of the Company to make any such reports or disclosures and he is not required to notify the Company that he has made such reports or disclosures. Further, Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, he may disclose the Company's trade secrets to his attorney and use the trade secret information in the court proceeding if he (A) files any document containing the trade secret under seal (unless prohibited from doing so by any court or administrative or government body); and (B) does not disclose the trade secret, except pursuant to court order.

## ARTICLE V
## MISCELLANEOUS

5.1    Withholding.    The Company may withhold from any payments of compensation or benefits made to Executive all applicable taxes, including but not limited to income, employment, and social insurance taxes, as required by law.

5.2    Amendments.    This Agreement may be modified only by a written agreement executed by the Company and Executive.

5.3    Notices.    All notices and other communications provided for hereunder shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient, (b) sent to the recipient by reputable express courier service (charges prepaid), (c) mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid or (d) emailed (.pdf) to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 11:59 p.m. Central Time on a Business Day, and otherwise on the next Business Day. Such notices and other communications shall be sent,

if to the Company, to its address at:

Hunt Financial Securities, LLC
c/o Hunt Companies, Inc.
980 North Michigan Avenue, Suite 1150
Chicago, IL  60611-4522
Attention:  Chris Hunt, Chief Executive Officer
Email:  Chris.Hunt@huntcompanies.com
Attention:  Kara Harchuck, General Counsel
Email:  Kara.Harchuck@huntcompanies.com

and if to Executive, at his address at:

William H. Jennings II
6 Homewood Lane
Darien, CT 06820
Email: WHJII@ICloud.com

with a copy to (which shall not constitute notice)

David Schwartz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Email:  David.Schwartz@Skadden.com

or to such other address or facsimile number or to the attention of such other Person as the recipient party has specified by prior notice to the sending party.

     5.4    <u>Waiver of Jury Trial</u>.  Each Party hereby irrevocably waives all right to trial by jury in any action, proceeding, or counterclaim (whether based on contract, tort, or otherwise) among them or their Affiliates arising out of or relating to this Agreement.

     5.5    <u>No Third-Party Beneficiaries</u>.  This Agreement is entered into solely for the benefit of the parties, and no Person shall be a third-party beneficiary hereof or otherwise entitled to enforce this Agreement.

     5.6    <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

11

5.7    Headings. The various headings of this Agreement executed pursuant hereto are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.

5.8    Governing Law. The laws of the State of New York shall govern all questions concerning the construction, validity, interpretation, and enforceability of this Agreement and the exhibits and schedules attached hereto, and the performance of the obligations imposed by this Agreement, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

5.9    Consent to Jurisdiction.

(a)    Each party hereby irrevocably and unconditionally submits, for himself or itself and his or its property, to the exclusive jurisdiction of the U.S. Federal District Court for the Southern District of New York, or if such court does not have subject matter jurisdiction over any matter, the New York State Supreme Court sitting in New York County, New York, and any appellate court thereof, over any action or proceeding arising out of or related to this Agreement or for recognition or enforcement of any judgment, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each party hereby agrees that service of summons, complaint, or other process in connection with any such proceeding may be made in the same manner set forth in Section 5.3 for providing notices, and that service so made shall be as effective as if personally made in the State of New York.

(b)    Each party irrevocably and unconditionally waives, to the fullest extent that he or it may legally and effectively do so, any objection that he or it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement in any New York State or federal court of the United States of America sitting in New York County, New York. Each party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

5.10    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns, except that Executive may not transfer any of his rights or obligation, hereunder.

5.11    Entire Agreement. This Agreement, together with the Management Agreement, constitutes the entire agreement among the Parties concerning the subject matter hereof and thereof and terminates, supersedes, and preempts any prior discussions, negotiations, understandings, agreements, term sheets, or representations by or among the Parties, written or oral, with respect to the subject matter of this Agreement.

5.12    Counterparts. This Agreement may be executed simultaneously in two or more separate counterparts, any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

5.13    Section 409A.  It is the Company's intent that payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code ("Section 409A"), to the extent subject thereto, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted and administered to be in compliance therewith. Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, Executive shall not be considered to have terminated employment with the Company or any subsidiary or affiliate thereof for purposes of this Agreement unless Executive would be considered to have incurred a "separation from service" from the Company or any of its subsidiaries or affiliates within the meaning of Section 409A ("Separation from Service"). Each amount to be paid or benefit to be provided under this Agreement shall be construed as a separate identified payment for purposes of Section 409A, and any payments described in this Agreement that are due within the "short term deferral period" as defined in Section 409A or any other exemption under Section 409A shall not be treated as deferred compensation unless applicable law requires otherwise. To the extent that any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" under Section 409A, any such reimbursements and in-kind benefits shall be paid to Executive in a manner consistent with Treas. Reg. Section 1.409A-3(i)(1)(iv). Without limiting the foregoing and notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to this Agreement during the six-month period immediately following Executive's Separation from Service shall instead be paid on the first business day after the date that is six months following Executive's Separation from Service (or death, if earlier). This Agreement may be amended in any respect deemed by the Company (with the consent of Executive) in good faith to be necessary in order to preserve compliance with Section 409A without imposing any additional interest, taxes or penalties on Executive.

5.14    Certain Expenses.  Within 30 days of being presented with an invoice, the Company will reimburse Executive his attorney's fees and costs incurred in connection with the negotiation of this Agreement and the Management Agreement, up to a maximum gross reimbursement amount of $50,000.

5.15    Construction and Interpretation.  When a reference is made in this Agreement to Sections or Exhibits, such reference shall be to a Section of or Exhibit to this Agreement unless otherwise indicated. The table of contents, headings, and footers contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Words in the singular form will be construed to include the plural, and vice versa, unless the context requires otherwise. Unless the defined term "Business Days" is used, references to "days" in this Agreement refer to calendar days. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event that any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all Parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Any obligation of any person under this Agreement to "cause" any other Person to take or refrain from taking any action shall be limited to the extent that such obligated Person has the ability to do so pursuant to applicable law or contract.

13

This EMPLOYMENT AGREEMENT is executed as of the date first set forth above.

**COMPANY:**

HUNT FINANCIAL SECURITIES, LLC, a
Delaware limited liability company

By: _Marc DeFife_
Name: _____
Title: _President_

**EXECUTIVE:**

_____

William H. Jennings II

14

This EMPLOYMENT AGREEMENT is executed as of the date first set forth above

**COMPANY:**

HUNT FINANCIAL SECURITIES, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

**EXECUTIVE:**

_____
William H. Jennings II

Exhibit 1

Release of Claims

As used in this Release of Claims (this "Release"), the term "claims" will include all claims, covenants, warranties, promises, undertakings, actions, suits, causes of action, proceedings, obligations, debts, accounts, attorneys' fees, judgments, losses, and liabilities, of whatsoever kind or nature, in law, in equity, or otherwise. Capitalized terms used but not defined in this Release will have the meanings given to them in the employment agreement dated January 9, 2017, between Hunt Financial Services, LLC (the "Company), and William H. Jennings II (my "Employment Agreement").

For and in consideration of the Severance Benefits, and other good and valuable consideration, I, for and on behalf of myself and my executors, heirs, administrators, representatives, and assigns, hereby agree to release and forever discharge Hunt Companies, Inc., and each of its direct and indirect subsidiaries (including the Company), and all of their respective predecessors, successors, and past, current, and future parent entities, affiliates, subsidiary entities, investors, directors, shareholders, members, officers, general or limited partners, employees, attorneys, agents, and representatives, and the employee benefit plans in which I am or have been a participant by virtue of my employment with or service to the Company (collectively, the "Company Releasees"), from any and all claims that I have or may have had against the Company Releasees based on any events or circumstances arising or occurring on or prior to the date hereof and arising directly or indirectly out of, relating to, or in any other way involving in any manner whatsoever my employment by or service to the Company or the termination thereof, including without limitation any and all claims arising under federal, state, or local laws relating to employment, including without limitation claims of wrongful discharge, breach of express or implied contract, fraud, misrepresentation, defamation, intentional infliction of emotional distress, whistleblowing, or liability in tort, and claims of any kind that may be brought in any court or administrative agency, and any related claims for attorneys' fees and costs, including, without limitation, claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000, et seq.; the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq.; the Civil Rights Act of 1866, and the Civil Rights Act of 1991; 42 U.S.C. Section 1981, et seq.; the Age Discrimination in Employment Act, as amended, 29 U.S.C. Section 621, et seq. (the "ADEA"); the Equal Pay Act, as amended, 29 U.S.C. Section 206(d); regulations of the Office of Federal Contract Compliance, 41 C.F.R. Section 60, et seq.; the Family and Medical Leave Act, as amended, 29 U.S.C. § 2601 et seq.; the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.; the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1001 et seq.; and any similar state or local law. I agree further that this Release may be pleaded as a full defense to any action, suit, arbitration, or other proceeding covered by the terms hereof that is or may be initiated, prosecuted, or maintained by me or my descendants, dependents, heirs, executors, administrators, or assigns. By signing this Release, I acknowledge that I intend to waive and release all rights known or unknown that I may have against the Company Releasees under these and any other laws.

I acknowledge and agree that as of the date I execute this Release, I have no knowledge of any facts or circumstances that give rise or could give rise to any claims under any of the laws

listed in the preceding paragraph and that I have not filed any claim against any of the Releasees before any local, state, federal, or foreign agency, court, arbitrator, mediator, arbitration or mediation panel, or other body (each individually a "Proceeding"). I (i) acknowledge that I will not initiate or cause to be initiated on my behalf any Proceeding and will not participate in any Proceeding, in each case, except as required by law; and (ii) waive any right that I may have to benefit in any manner from any relief (whether monetary or otherwise) arising out of any Proceeding, including any Proceeding conducted by the Equal Employment Opportunity Commission ("EEOC"). Further, I understand that, by executing this Release, I will be limiting the availability of certain remedies that I may have against the Company and limiting also my ability to pursue certain claims against the Company Releasees.

By executing this Release, I specifically release all claims relating to my employment and its termination under ADEA, a federal statute that, among other things, prohibits discrimination on the basis of age in employment and employee benefit plans.

Notwithstanding the generality of the foregoing, I do not release (i) claims to receive my Severance Benefits in accordance with the terms of the Employment Agreement; (ii) claims that cannot be waived by law; or (iii) rights to indemnification or coverage under any insurance policy maintained by the Company. Further, nothing in this Release shall prevent me from (i) initiating or causing to be initiated on my behalf any claim against the Company before any local, state, or federal agency, court, or other body challenging the validity of the waiver of my claims under the ADEA (but no other portion of such waiver); or (ii) initiating or participating in an investigation or proceeding conducted by the EEOC

I acknowledge that I have been given at least [21]/[45][1] days in which to consider this Release. I acknowledge further that the Company has advised me to consult with an attorney of my choice before signing this Release, and I have had sufficient time to consider the terms of this Release. I represent and acknowledge that if I execute this Release before [21]/[45] days have elapsed, I do so knowingly, voluntarily, and upon the advice and with the approval of my legal counsel (if any), and that I voluntarily waive any remaining consideration period.

I understand that after executing this Release, I have the right to revoke it within seven days after its execution. I understand that this Release will not become effective and enforceable unless the seven-day revocation period passes and I do not revoke the Release in writing. I understand that this Release may not be revoked after the seven-day revocation period has passed. I understand also that any revocation of this Release must be made in writing and delivered to the Company at its principal place of business within the seven-day period.

This Release will become effective, irrevocable, and binding on the eighth day after its execution, so long as I have not timely revoked it as set forth above. I understand and acknowledge that I will not be entitled to the Severance Benefits unless this Release is effective on or before the date that is 60 days following the date of my termination of employment.

---

[1] NTD:  To be selected based on whether applicable termination was "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967).

I hereby agree to waive any and all claims to re-employment with the Company or any of its affiliates and affirmatively agree not to seek further employment with the Company or any of its affiliates.

The provisions of this Release will be binding upon my heirs, executors, administrators, legal representatives, and assigns. If any provision of this Release will be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision will be of no force or effect. The illegality or unenforceability of such provision, however, will have no effect upon and will not impair the enforceability of any other provision of this Release.

ARTICLE V of my Employment Agreement is incorporated herein by reference in its entirety, and made a part hereof, *mutatis mutandis*.

_____

William H. Jennings II

_____

DATE

# EXHIBIT "E"

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PERFORMANCE TRUST CAPITAL
PARTNERS, LLC,

              Plaintiff

    v.

HUNT COMPANIES, INC.,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:  Index No. 651355/2017
:
:  **AFFIDAVIT OF JAMES C. HUNT**
:
:
:
:
:
:
:
:

STATE OF ILLINOIS      )
                       )    s.s.:
COUNTY OF COOK    )

James C. Hunt, being duly sworn, deposes and says:

1.    I make this declaration based on my personal knowledge. If called to testify about such matters, I would be able to do so.

2.    I am currently employed by Hunt Companies, Inc. ("Hunt"), serving as Hunt's Chief Executive Officer. I have been employed by Hunt in various positions since 1993.

3.    I have read Performance Trust Capital Partners' Complaint as well as the affidavit of David Wilding. A number of the points made in those documents are either false or highly misleading. I have specific concerns with three things in particular: (a) the timeline that Performance Trust presents, which ignores certain highly pertinent facts; (b) Performance Trust's suggestion that Hunt engaged in conversations with Performance Trust in order to gain an unfair advantage; and (c) Performance Trust's argument that Hunt is unfairly using Performance Trust's confidential information to solicit Performance Trust's employees or customers. Each of these arguments is false.

4. First, as discussed below, Hunt was actively working throughout 2016 to build out its broker-dealer division, Hunt Financial Securities, LLC, including during the brief window in which it was discussing acquiring an interest in Performance Trust.

5. Second, Hunt has not unfairly benefited from its negotiations with Performance Trust, insomuch as it: (a) does not possess and has not used any Performance Trust confidential or proprietary information in conducting its business; (b) was never provided the names of Performance Trust's customers or employees, and were certainly never provided any information connecting specific customers or employees to their performance metrics; and (c) was already familiar with Steve Kirchner, Solomon Berkoff, and Jay Yun Park **because Performance Trust tasked Kirchner, Berkoff, and Park with soliciting Hunt's business before Hunt ever signed the non-disclosure agreement**.

6. Just as importantly, Performance Trust solicited Hunt to participate in Performance Trust's ongoing bid process, not the other way around. In other words, Performance Trust claims that Hunt engaged in the bid process to gain confidential information to use against Performance Trust, but fails to mention, anywhere, that it was Performance Trust that approached Hunt to request Hunt enter its ongoing process.

7. Third, it seems patently inappropriate to me that Performance Trust would try to prohibit Kirchner, Berkoff, and Park from taking employment with Hunt, when these individuals' employment agreements (a) do not prohibit them from taking employment with a competitor and (b) permit them to solicit—on anyone's behalf—the list of customers attached as Exhibit A to their agreements. These are the only customers they are soliciting on Hunt's behalf.

8. Given that Hunt is not using Performance Trust's "confidential information," Performance Trust did not identify who its customers are to Hunt, and were already aware of and

2

38106685v.1

knew Kirchner, Berkoff, and Park, it seems unbelievable that Performance Trust now seeks to bar these employees from working for Hunt.

9.      Hunt is privately owned and dedicated to fostering long-term partnerships through the development, investment, management, and financing of real estate assets.

10.     Founded in 1947 and headquartered in El Paso, Texas, Hunt is a diverse, full-service real estate company. The company's business focuses on real estate investments, military communities, public infrastructure, financial services, and asset services. Hunt's family of companies is committed to creating valuable solutions and effective partnerships with public and private sector clients worldwide.

11.     One of Hunt's subsidiaries is Hunt Financial Securities, LLC ("Hunt Financial"). Hunt Financial is in the business of buying and selling securities such as stocks, bonds, mutual funds and other investment-related products. Hunt Financial is FINRA-registered and is licensed to engage in securities transactions on behalf of its customers (as a broker) or for its own account (as a dealer).

12.     Beginning in January 2016, Hunt began internal discussions to build out Hunt Financial. To that end, it engaged in conversations with the Government National Mortgage Association (also known as Ginnie Mae) in January 2016, submitting its application to trade and broker mortgage-backed securities in April 2016. As of March 17, 2016, Hunt filed a Continuing Membership Application ("CMA") with FINRA in which Hunt requested FINRA's approval for expansion of its existing platform. In these applications and other FINRA-related activities, Hunt disclosed its intent to hire at least 15 individuals in this space.

3

13. Over the next several months, I continued to have conversations with various individuals in the industry about the possibility of that person or persons coming over to lead Hunt's build-out plans.

14. In the late summer of 2016, Marc DeFife spoke with Bill Jennings about the possibility of building out Hunt Financial in the future. Eventually Marc DeFife, Bill Jennings, and I had dinner in New York, New York, which occurred on October 4, 2016.

15. Around the same time, in mid-September 2016, Performance Trust approached Hunt, asking if Hunt would be interested in participating in Performance Trust's attempt to acquire additional capital, in exchange for a certain percentage of Performance Trust's business.

16. As I understand it, this invitation occurred after Marc DeFife met with Steve Kirchner, Jay Park, and Chirag Shah in Chicago on September 6, 2016.

17. After this meeting Mr. Shah reached out to Marc DeFife, indicating that Hunt and Performance Trust may have certain synergies and asking if Hunt would like to participate in Performance Trust's capital raise.

18. Because Hunt had some interest in hearing more about this possibility, Hunt executed a Confidentiality Agreement on September 22, 2016. Prior to that time, Hunt had no substantive conversations with Performance Trust and had no expectation as to what Performance Trust intended to present in anticipation for bids being made. In other words, Hunt had no idea whether Performance Trust intended to disclose or introduce Hunt to Performance Trust's customers or employees.

19. In their subsequent meetings and even after Performance Trust gave Hunt access to its virtual Data Room, Performance Trust neither identified nor introduced Hunt to its customers or employees.

4

38106685v.1

20.     On or around September 23, 2016, Sagent Advisors, an entity engaged by Performance Trust, sent a 78-page PDF, entitled "Confidential Information Presentation." This was the only document provided to Hunt via email during the course of the negotiations of which I am aware. I only located this document in preparing this affidavit and have not referred to or reviewed this document in any context since Hunt's negotiations broke off with Performance Trust. However, in this document, none of Performance Trust's customers are identified by name or described in a manner which would allow Hunt to "reverse engineer" Performance Trust's customers. Further, none of Kirchner, Berkoff, or Park are identified in any manner in the Confidential Information Presentation.

21.     On September 28, 2016, Rich Berg, Performance Trust's CEO, Paul Kopsky, Hunt's then-EVP and COO, Marc DeFife, and I had dinner in Austin, Texas, to discuss Performance Trust's business and get to know one another.

22.     On October 8, 2016, prior to being given access to Performance Trust's virtual Data Room, Hunt made an offer to acquire a 30 percent stake in Performance Trust. This bid was submitted directly to Matthew Epstein and Jordan Finkler, two of Performance Trust's outside advisors who were associated with Sagent Advisors.

23.     At the time of submitting its bid, Performance Trust had not made its virtual Data Room available, but had already scheduled a meeting to take place between Hunt and Performance Trust on October 24, 2016.

24.     The Data Room was finally opened late in the evening on October 18, 2016, less than a week before the October 24, 2016, meeting, which necessitated Marc DeFife and Paul Kopsky to quickly perform the due diligence necessary for Hunt to evaluate and better understand Performance Trust's Financial Investment Group ("FIG") business, which made up

5

38106685v.1

the bread-and-butter of Performance Trust's business and is a business in which Hunt was not then and is not currently engaged.

25.     On October 24, 2016, Paul Kopsky, Marc DeFife, and I met with Performance Trust and pitched Hunt's bid.

26.     Through David Wilding's affidavit, I understand that Performance Trust claims that Steve Kirchner was present in the meeting. This is not true. In fact, at no time during the course of Hunt's conversations with Performance Trust about possibly acquiring a stake in Performance Trust were any of Kirchner, Berkoff, or Park present.

27.     After the October 24, 2016 meeting, I understand from Marc DeFife that he and Paul Kopsky met with Matthew Epstein in New York on November 3, 2016, during which time Epstein stated that Hunt's bid was significantly lower than other bidders. Further, my understanding is that a call occurred the next day, on November 4, 2016, between DeFife, Kopsky, and Epstein, where Epstein continued to tell them where Hunt's bid was lacking.

28.     Based on this, Hunt continued its conversations with Bill Jennings about Jennings being engaged to eventually work with Hunt to help ramp up and launch an expansion for Hunt Financial.

29.     On or around November 17, 2016, Hunt sent a proposed term sheet to Jennings for this position.

30.     During none of my calls or meetings with Jennings did we ever directly discuss Performance Trust. The most I ever told him is that Hunt was considering buying a stake in a company that might obviate the need for hiring Jennings.

6

38106685v.1

31.     Moreover, during these conversations, I never discussed potential individuals or companies for Hunt Financial to hire, and certainly did not suggest or direct anyone to hire Performance Trust employees.

32.     Shortly before Thanksgiving, Rich Berg reached out to me directly and asked for another meeting to discuss Hunt's offer and to see if Hunt would be willing to continue these discussions. I agreed.

33.     On November 28, 2016, I met Rich Berg at the DuPage Airport, on my way out of town to New York, to continue my discussions with Bill Jennings. During the course of this meeting, Berg requested $50 million for a 24.9 percent interest in Performance Trust.

34.     At the time, while this number was feasible, I expressly told Berg that we needed to commit this to a Letter of Intent ("LOI"). I further explained that I wanted the LOI to be exclusive and only wanted to go down this road if Performance Trust was equally committed to Hunt. I suggested that Hunt would prepare the LOI.

35.     On November 30, 2016, I received a call from Matthew Epstein and Jordan Finkler, the Sagent Advisors individuals who were representing Performance Trust. During the call, Epstein and Finkler said they would prepare the LOI. I again reiterated that Hunt wanted the LOI to be exclusive. During that call, Epstein also said that Performance Trust wanted a call option. I said that Hunt would only agree to this if there were a floor equal to the price at which Hunt acquired its stake.  Epstein stated to me that he would advise Performance Trust of my specific requirements before sending the LOI.

36.     Later that day, on November 30, 2016, Sagent Advisors sent a summary of terms to Hunt.  The Summary did not include exclusive terms and further included the call option with no floor. As I had already specifically instructed, this was a deal breaker for me. In light of my

7

clear indications to them that these points were Hunt's threshold issues, upon confirmation from Sagent that the draft LOI had been vetted internally at Performance Trust, their failure to incorporate these provisions caused me to lose faith in Performance Trust.

37.     We immediately informed Sagent that these terms were unacceptable. Over the next few days, Sagent continued to try to engage us in additional conversations, but Hunt and Performance Trust were in fundamentally different places: Hunt wanted exclusivity and it appeared that Performance Trust wanted to be able to continue to shop Hunt's bid.  A Hunt representative informed Sagent on December 2, 2016 that we would not be countering their summary of terms and were exiting the bid process.

38.     Because Hunt was already in advanced negotiations with Jennings, Hunt simply continued down this path, which was consistent with Hunt's plan before Performance Trust approached Hunt in September.

39.     Hunt and Jennings eventually agreed to definitive documents on January 9, 2017. Based on the terms of the documents, Jennings and his team were provided with certain autonomy to grow Hunt Financial's broker-dealer business, which included Hunt Financial's hiring of employees without oversight or input from Hunt.

40.     To that end, I understand that Brian Pereira, for Hunt Financial, made offers to Kirchner, Berkoff, and Park in January 2017. It was only after Kirchner, Berkoff, and Park had accepted these offers of employment that I or Marc DeFife or anyone involved in Hunt's conversations with Performance Trust learned of these offers and Kirchner, Berkoff, and Park's acceptances.

41.    Even though Hunt hired Kirchner, Berkoff, and Park and even though Performance Trust claims that Hunt has breached the Confidentiality Agreement, I do not believe Hunt did anything wrong.

42.    First, Hunt does not possess and has not used Performance Trust's information, whether that information is confidential or not. Hunt was provided limited access to a virtual Data Room, which it has not accessed in months and to the extent information was available virtually, Hunt does not believe it possesses any such information today.  Most importantly, Hunt did not use information obtained through the Data Room or other due diligence for any purpose other than to evaluate the potential transaction with Performance Trust. Moreover, one of the individuals that accessed the room, Paul Kopsky, has not even been employed by Hunt since November 11, 2016. Put simply, Hunt is already abiding by the confidentiality terms: it does not possess Performance Trust's confidential information and it has not used that information.

43.    Second, Performance Trust never provided us information about any of its employees or about its customers. This is important because Performance Trust claims that we unfairly profited from Hunt's negotiations with Performance Trust. This is simply not true. We were not introduced to Kirchner, Berkoff, or Park through these negotiations and we did not learn anything about them in the negotiations.

44.    Third, Performance Trust is trying to prevent Hunt from soliciting or doing business with its "customers", but Hunt has no clue who Performance Trust's customers are. Moreover, Hunt has expressly told Kirchner, Berkoff, and Park that the only customers that they are allowed to solicit are those customers that are on the non-solicitation excluded list (which I understand is Exhibit A to each of their agreements). What this means, practically speaking, is

9

38106685v.1

that, if the court ordered Hunt to not solicit Performance Trust's customers, since Hunt does not know who those customers are, Hunt could inadvertently violate the agreement.

45.     But, even prohibiting Hunt from soliciting customers would be patently unfair. Performance Trust never provided Hunt with any confidential information or other information generally about its customers and Performance Trust seems to be trying to prevent Hunt from doing something that Kirchner, Berkoff, and Park are not even contractually prohibited from doing.

46.     Fourth, Performance Trust is trying to prevent Hunt from hiring Kirchner, Berkoff, and Park, but Hunt already knew each of Kirchner, Berkoff, and Park before it signed the Confidentiality Agreement. In fact, Performance Trust tasked Kirchner, Berkoff, and Park to solicit Hunt's business. I think it would be unfair to prevent Hunt from hiring individuals it knew before the Confidentiality Agreement was signed and about whom Hunt never received confidential information. Performance Trust is basically trying to create a non-compete agreement with its employees where one does not exist.

47.     Finally, I think it is worth noting that, in reading Performance Trust's filing, they do not identify any information they claim Hunt is using or provide any information about clients they have lost. In fact, its papers are silent on this point.

48.     Despite all of this, Performance Trust demanded $50 million dollars before filing its suit and now claims that its damages are $50 million. It seems beyond coincidental that the deal price we supposedly agreed upon was $50 million and that is what Performance Trust's damage claim is now. This lawsuit smells like sour grapes and it seems like Performance Trust is trying to "raise" its capital through this lawsuit. That seems wrong to me.

38106685v.1

James C. Hunt

Sworn and subscribed to before me
this 16th day of March 2017

Mary Louise Tatum

Notary Public

OFFICIAL SEAL
MARY LOUISE TATUM
Notary Public - State of Illinois
My Commission Expires Aug 18, 2019

38106685v.1

# EXHIBIT "F"

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PERFORMANCE TRUST CAPITAL                 :    Index No. 651355/2017
PARTNERS, LLC,                            :
                                          :    **AFFIDAVIT OF MARC DEFIFE**
                    Plaintiff             :
                                          :
        v.                                :
                                          :
HUNT COMPANIES, INC.,                     :
                                          :
                    Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STATE OF ILLINOIS           )
                            )    s.s.:
COUNTY OF COOK              )

Marc DeFife, being duly sworn, deposes and says:

1.      I make this declaration based on my personal knowledge. If called to testify about such matters, I would be able to do so.

2.      I am currently employed by an affiliate of Hunt Companies, Inc. ( "Hunt"), and serve as President of Hunt Financial Securities, LLC ("Hunt Financial"). I have been employed by Hunt since 2015. Prior to that time, I was employed by Jefferies & Company for six years, during which I worked with Steve Kirchner, Bill Jennings, and Brian Pereira. Before that, I was employed by Lehman Brothers for eight years.

3.      I have read Performance Trust Capital Partners' Complaint as well as the affidavit of David Wilding. A number of the points made in those documents are either false or highly misleading. In particular, I'm concerned with three things: (a) Performance Trust claims that Hunt only negotiated with it to gain Performance Trust's confidential information to build its own business out, which is completely untrue; (b) Performance Trust's claim that Hunt received, still possesses, and is using Performance Trust's confidential information about Performance

[FILED: NEW YORK COUNTY CLERK 03/20/2017 11:50 AM]
Case 1:18-cv-01793-JFK   Document 1-2   Filed 02/27/18   Page 34 of 47
RECEIVED NYSCEF: 03/20/2017

Trust's customers and employees; and (c) Performance Trust's claim that Hunt only met Steve Kirchner, Solomon Berkoff, and Jay Yun Park because of these negotiations. Each of these arguments is false.

4.   First, as discussed below, Hunt was actively working throughout 2016 to build out Hunt Financial.

5.   Second, Hunt never received any confidential information about Performance Trust's employees or customers and, based on my review of my files, I do not have any of Performance Trust's information in my possession that was provided by Performance Trust through its virtual Data Room.

6.   Third, I was already familiar with Steve Kirchner, having worked with him for years at Jefferies. Moreover, Kirchner, Berkoff, and Park all solicited Hunt's business on Performance Trust's behalf, before Hunt signed the Confidentiality Agreement with Performance Trust.

7.   Further, it's also important to note that Performance Trust solicited Hunt to participate in Performance Trust's ongoing bid process, not the other way around. This was not a situation where Hunt tried to gain a competitive advantage through this bid process, but, rather, one where Performance Trust decided, on its own, to invite Hunt to participate.

8.   As I mentioned before, Hunt Financial was looking to build out its business starting in early January 2016. During that month, we engaged in conversations with the Government National Mortgage Association (also known as Ginnie Mae) about Hunt Finanical becoming a Ginnie Mae Multifamily Multiclass Sponsor. Hunt Financial eventually submitted an application seeking to trade and broker mortgage-backed securities in April 2016. As of March 17, 2016, Hunt also filed a Continuing Membership Application with FINRA in which Hunt

requested FINRA's approval for expansion of its existing platform. In these applications and other FINRA-related activities, Hunt Financial disclosed its intent to hire at least 15 individuals in this space.

9.       Over the next several months, I understand that Chris Hunt, Hunt Companies' CEO, continued to have conversations with various individuals in the industry about the possibility of that person or persons coming over to lead Hunt's build-out plans.

10.      I understand that eventually Hunt began serious discussions with Bill Jennings about Hunt hiring Jennings to help build out Hunt Financial.

11.      I've known Bill for close to ten years, having worked with him at Jefferies & Company.

12.      In late summer of 2016, Chris Hunt, Bill Jennings, and I had dinner in Austin, Texas, which occurred on October 4, 2016, to continue our discussions about hiring Bill.

13.      Regarding Performance Trust, on September 6, 2016, I held a meeting in Chicago with Steve Kirchner, Jay Park, and Chirag Shah, during which Kirchner, Park, and Shah solicited Hunt's business on Performance Trust's behalf. As mentioned before, I had known Steve Kirchner for nearly 10 years, based on us working together at Jefferies.

14.      While the meeting was taking place, Shah left, unexpectedly. A day or so later, he contacted me and said that he thought that Hunt and Performance Trust had good synergies. He further explained that Performance Trust was already engaged in a process where they were seeking to raise capital, that Performance Trust had engaged Sagent Advisors to act on Performance Trust's behalf, and he asked whether Hunt might be interested in becoming involved in the bid process.

Case 1:18-cv-01793-JFK   Document 1-2   Filed 02/27/18   Page 36 of 47   RECEIVED NYSCEF: 03/20/2017

15.     I told him that I would need to talk with Chris Hunt. Eventually, we agreed to get involved in the bid process.

16.     On September 23, 2016, Sagent provided a 78-page PDF document, entitled the "Confidential Information Presentation." From the best of my recollection, this document essentially outlined the amount of business that Performance Trust was doing.

17.     On September 28, 2016, Rich Berg, Performance Trust's CEO, Paul Kopsky, Hunt's then-EVP and COO, Chris Hunt, and I had dinner in Austin, Texas, to discuss Performance Trust's business and get to know one another.

18.     On October 8, 2016, Hunt made an offer to acquire a 30 percent stake in Performance Trust. At the time of submitting its bid, Performance Trust had not made its virtual Data Room available, but had already scheduled a meeting to take place between Hunt and Performance Trust on October 24, 2016.

19.     The Data Room was finally opened late in the evening on October 18, 2016, less than a week before the October 24, 2016, meeting. Because of the short timeframe, Paul Kopsky and I had to quickly perform the due diligence necessary for Hunt to evaluate and better understand Performance Trust's Financial Investment Group ("FIG") business, which made up the bread-and-butter of Performance Trust's business and is a business in which Hunt was not then and is not currently engaged.

20.     In reviewing this data, I can state definitively that no information was provided about Performance Trust's customers or employees. Indeed, Performance Trust specifically and intentionally masked the identity of its employees by instead referring to employees as "Trader A" or something along those lines, whenever any data was provided about someone. Put another

way, I have no idea which Performance Trust employee did what business or who was a good trader or a bad trader at Performance Trust, based on the data Performance Trust provided.

21.     Beyond this, though, I really was not looking at Performance Trust's data to learn about its employees or its customers. Instead, my review was much more high level and was intended to determine whether the numbers that Sagent presented in the Confidential Information Presentation were borne out by the financial documents provided in the virtual Data Room.

22.     On October 24, 2016, Paul Kopsky, Chris Hunt, and I met with Performance Trust and pitched Hunt's bid.

23.     Through David Wilding's affidavit, I understand that Performance Trust claims that Steve Kirchner was present in the meeting. This is not true. In fact, at no time during the course of Hunt's conversations with Performance Trust about possibly acquiring a stake in Performance Trust were any of Kirchner, Berkoff, or Park present.

24.     After the October 24, 2016 meeting, Paul Kopsky and I met with Matthew Epstein in New York on November 3, 2016. During this meeting, Epstein told Paul and me that Hunt's bid was significantly lower than other bidders. The next day, Paul, Epstein, and I held a call, where Epstein continued to tell us that Hunt's bid was not as good as other bids.Based on this, I told Chris Hunt that it looked like Hunt was out of the negotiations.

25.     On November 30, 2016, Sagent Advisors sent a Summary of Terms to Hunt.  To our surprise based on prior discussions, the Summary did not include an exclusivity provision, but included a call option with no floor.

26.     We immediately informed Sagent that these terms were unacceptable. Over the next few days, Sagent continued to try to engage us in additional conversations, but Hunt and Performance Trust were in fundamentally different places: Hunt wanted exclusivity and it

appeared that Performance Trust wanted to be able to continue to shop Hunt's bid. I informed Sagent on December 2, 2016 that Hunt would not be countering their summary of terms and were exiting the bid process.

27.    Hunt continued its conversations with Bill Jennings about Jennings being engaged to eventually work with Hunt to help ramp up and launch an expansion for Hunt Financial.

28.    Moreover, after the deal with Performance Trust fell apart, we continued our negotiations with Jennings throughout the month of December, until we finally reached terms on January 9, 2017.

29.    Shortly thereafter, an affiliate of Hunt hired Brian Pereira, who I'd known from our joint employment at Jefferies. In an effort to ramp up the platform in advance of Hunt Financial's expansion launch, Pereira made offers to Kirchner, Berkoff, and Park in January 2017. Pereira and I did not speak about these offers in advance of Pereira extending them.

30.    While I know that Performance Trust claims that Hunt learned about Kirchner, Berkoff, and Park during its negotiations with Performance Trust, this is simply not true. Each of these individuals were soliciting Hunt's business before and during the time when Performance Trust invited Hunt to participate in the bid process.

31.    As I previously mentioned, I met with Kirchner and Park in Chicago on September 6, 2016.

32.    Additionally, on October 26, 2016, I met with Kirchner and Berkoff in New York to discuss how Performance Trust was capable of distributing and structuring Hunt loans and tax liens and how Performance Trust could sell Hunt Freddie B pieces for one of Hunt's funds.

33.    During this meeting, no discussion occurred about Hunt's bid to purchase a portion of Performance Trust.

FILED: NEW YORK COUNTY CLERK 03/20/2017 11:50 AM
NYSCEF DOC. NO. 24
RECEIVED NYSCEF: 03/20/2017

34.     I am aware that Performance Trust claims that Hunt learned about or met with Park and Berkoff on November 4, 2016, but this is simply not true. While I had a call with Epstein, of Sagent, on November 4th, I can state definitively that no discussion occurred about Kirchner, Berkoff, or Park during that or any other conversation with Performance Trust.

[The rest of this page is left blank intentionally.]

_____

Marc DeFife

Sworn and subscribed to before me
this __16th__ day of March 2017

Notary Public

OFFICIAL SEAL
MARY LOUISE TATUM
Notary Public - State of Illinois
My Commission Expires Aug 18, 2019

# EXHIBIT "G"



HUNT FINANCIAL SECURITIES, LLC
230 Park Avenue, 19th Floor
New York, NY 10169
212.317.5700

January 29, 2018


Management Committee Memorandum

Re: Jennings Compensation for 2017


1. HFS has exceeded the agreed upon thresholds in the Management Agreement for 2017 in regards to total expenditures and bonus requests (I.e., the Initial Non-Compensation Expense Amount, and the Initial Operation Expense Allocation).

2. According to Bill Jennings's Employment Agreement, if there is not sufficient Initial Operating Expense Allocation in Fiscal Year 2017 to accommodate the payment of a Bonus to Jennings, then no Bonus is required.

3. However, in recognition of his merit and performance, the Management Committee agrees to grant a discretionary bonus to Jennings of $1,500,000, applicable to Fiscal Year 2017 only, with 25% held back per the Management Agreement. This discretionary bonus does not create an amendment to the Management Agreement or Employment Agreement and does not create any obligation for future awards. HFS will pay the discretionary bonus on or prior to February 1, 2018.

4. All other overages in Fiscal Year 2017 only will be borne by Hunt but per the Management Agreement, will continue to count towards any future capital or distribution calculations.

5. Per the Management Agreement, but for the avoidance of any doubt, the total compensation pool will be calculated as 65% of Revenues in 2018. Total compensation includes without limitation, salaries, commissions, trader payouts, sign on bonuses, employee benefits, incentive bonuses, held-back comp, held-back return, long term incentives, internal consultant payments or costs, withholding and payroll taxes and any other employee payments or benefits.

6. Per the Management Agreement, but for the avoidance of any doubt, the Non-Compensation Expense Cap of 20% continues to apply. Any overages will come out of the total comp pool allocation (i.e., the Compensation Percentage).

7. Per the Management Agreement, but for the avoidance of any doubt, the total comp pool will be calculated and determined by the Management Committee after the closing of each Fiscal Year and approved by the Management Committee during that time. Until such formal approval is given in writing, no communication of bonuses will be made to employees of HFS.

8. If Jennings voluntarily resigns from HFS within the next 30 months (from the date of this memo) for any reason other than for Good Reason (as defined in his Employment

Agreement), the $1,500,000 provided for in paragraph 3 will be immediately due and payable back to Hunt within 60 days of his resignation.

Please sign and acknowledge agreement to the points above.

HFS Management Committee:

_____
Marc DeFife

_____
Scott Campbell

By executing this memo, Bill Jennings agrees to its contents in his individual capacity as well as his capacity as Management Committee member.

_____
Bill Jennings

# EXHIBIT "H"



HUNT FINANCIAL SECURITIES, LLC
230 Park Avenue, 19ᵗʰ Floor
New York, NY 10169
Member FINRA and SIPC

From: HFS Management Committee
To: Bill Jennings
Re:  Management Agreement and Employment Agreement
Date: February 1, 2018


Bill:

As you know, we have been attempting to work with you on your compensation request for your bonus, as well as the 2017 Budget (including the Initial Operating Expense Allocation and Initial Non-Compensation Expense Amount).  In October, we discussed a potential resolution to the over-Budget issues, but those numbers continued to increase over time, and a final approval was never reached.  On January 30, 2018, we presented you with a final offer, which you refused.  You have threatened to quit if we fail to pay you a $1,500,000 Bonus that you believe is owed to you under your Employment Agreement.  However, pursuant to your Employment Agreement, "for the avoidance of doubt, no Bonus shall be paid in respect of a given Fiscal Year in which there are not sufficient Revenues (or with respect to Fiscal Year 2017, Initial Operating Expense Allocation) to accommodate the payment of such Bonus (together with all other Aggregate Compensation for such Fiscal Year) within the Compensation Percentage for such Fiscal Year."  As such, no Bonus is due to you under your Employment Agreement.  Over the past weeks and months, you have threatened to quit multiple times, in each instance, to exert pressure on Hunt in an attempt to extract a favorable outcome for your interests.  As with this latest threat, your actions and threats have repeatedly put your own interests ahead of those of the Business, demonstrating a lack of good faith, lack of loyalty and lack of care to the Business.  We do not believe you have (now or in the past) Good Reason to resign, and as you know the Agreements do not permit you to resign without Good Reason.  However, if you would like to resign without Good Reason, we would be prepared to accept that resignation as of today.  We reserve all rights under the Agreements, including to obtain a release of claims in connection with this matter.

Atlanta  |  Chicago  |  Columbia  |  Denver  |  El Paso  |  Honolulu  |  Los Angeles  |  Memphis  |  Miami  |  New York  |  Philadelphia  |  Sacramento  |  San Francisco  |  Washington D.C.
INTERNATIONAL OFFICES:  Abu Dhabi  |  London  |  Mexico City

DEVELOP.  INVEST.  MANAGE.                                                                                                    huntcompanies.com

If, however, you do not choose to leave voluntarily, we are putting you on notice today that we have good Cause to terminate you pursuant to your Employment Agreement.

You have materially breached the Management Agreement and Employment Agreement (the "Agreements"). Contrary to the Agreements, without limitation, you have failed to:

1    Operate the Business in a manner materially consistent with, and/or stay within, the Budget, Initial Operating Expense Allocation and Non-Compensation Expense Amount;

2    Obtain Management Committee approval prior to communicating compensation/bonus amounts to employees;

3    Obtain Management Committee's approval prior to setting the Allocation Percentages for each of the Executive Committee members and prior to communicating those percentages to them. Furthermore, you have failed to present the Committee with the full list of Executive Committee members and their Allocation Percentages for approval at all;

4    Include the Held-back Portion in the compensation figures presented to Executive Committee members. You also failed to communicate to such Executive Committee members that those held-back portions are required, or how they work.

5    Present a Business Plan to the Management Committee for approval for 2018;

6    Conduct yourself in a professional manner and adhere to all applicable Company rules, policies and procedures. You have repeatedly failed to use your reasonable best efforts to faithfully perform your responsibilities in a diligent, trustworthy, efficient and businesslike manner so as to advance the best interests of the Business.

If you fail to resign, subject to and in accordance with the terms of your Agreement, your termination for Cause will become effective in thirty (30) days from the date of this notice.

We believe it is in the best interest of all parties to resolve this matter amicably. We ask and expect that you no longer physically enter the office, attempt to remotely access our systems, or discuss this matter or the Business with other employees.

Please have your attorneys contact Kara Harchuck, at 312-799-3929.


Management Committee

Marc Defife
Scott Campbell


Cc:  David Schwartz (via courier service)